UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE NEW YORK CITY TRIATHLON, LLC,          Civ. No. 10 CV 1464 (CM)

        Plaintiff,

        -against-

NYC TRIATHLON CLUB, INC.,

        Defendant.

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Peter A. Bicks
Lisa T. Simpson
Aaron G.R. Rubin
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, NY 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151

Attorneys for Plaintiff
The New York City Triathlon, LLC

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

STATEMENT OF FACTS ...................................................................... 2

ARGUMENT ...................................................................................... 4

NYC TRIATHLON IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF ............ 4

I.    DEFENDANT'S UNLAWFUL ACTS ARE CAUSING IMMEDIATE
      AND IRREPARABLE HARM TO NYC TRIATHLON ................................ 5

II.   NYC TRIATHLON IS LIKELY TO SUCCEED
      ON THE MERITS OF ITS CLAIMS ................................................ 7

      A.    NYC Triathlon is Likely to Prevail on its Lanham Act §43(a) Claim ........ 8

            1.    The NYC TRIATHLON Marks are Strong,
                  Having Acquired Secondary Meaning ................................ 9

            2.    The NYC Tri Club Marks are Nearly Identical
                  to the NYC TRIATHLON Marks ..................................... 14

            3.    NYC Triathlon's Services are in Close Competitive Proximity to
                  Defendant's Services and Plaintiff Has Already Bridged Any Gap ...... 15

            4.    Evidence of Actual Confusion Exists ............................... 17

            5.    Defendant Lacks Good Faith ...................................... 18

            6.    Defendant Offers Low Quality Services ............................ 19

            7.    The Sophistication of Consumers Fosters Confusion ............... 20

      B.    Plaintiff is Also Likely to Succeed on its Federal Claim for Dilution ......... 22

            1.    The NYC TRIATHLON Marks are Famous .......................... 22

            2.    Defendant's Use of its Mark Began after the
                  NYC TRIATHLON Marks Became Famous .......................... 24

            3.    Defendant's Actions Are Likely to
                  Dilute the NYC TRIATHLON Marks ................................ 25

      C.    Defendant has Violated the Anticybersquatting Consumer Protection Act ......... 27

      D.    Plaintiff Is Also Likely to Succeed on its
            Remaining New York State Law Claims .................................. 29

III.  A BALANCE OF THE HARDSHIPS TIPS
      DECIDEDLY TOWARDS PLAINTIFF ............................................ 30

CONCLUSION .................................................................................. 32

# TABLE OF AUTHORITIES

Page

## CASES

A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,
    470 F.2d 689 (2d Cir. 1972)................................................................14

Abercrombie & Fitch Co. v. Hunting World, Inc.,
    537 F.2d 4 (2d Cir. 1976)................................................................9 n.3

Am. Express Co. v. Am. Express Limousine Serv.,
    772 F. Supp. 729 (E.D.N.Y. 1991) ....................................................14

Artisan Mfg. Corp. v. All Granite & Marble Corp.,
    559 F. Supp. 2d 442 (S.D.N.Y. 2008)................................................18

Bellbrook Dairies, Inc. v. Hawthorn-Mellody Farms Dairy, Inc.,
    253 F.2d 431 (C.C.P.A. 1958) ..........................................................14

Broadbridge Media, L.L.C. v. hypercd.com,
    106 F. Supp. 2d 505 (S.D.N.Y. 2000)................................................27

Burberry Ltd. and Burberry USA v. Designers Imports, Inc.,
    No. 07 Civ 3997 (PAC), 2010 WL 199906 (S.D.N.Y. Jan 19, 2010) ....................21 n.6, 22

Burberry Ltd. v. Euro Moda, Inc.,
    No. 08 Civ. 5781 (CM), 2009 WL 1675080 (S.D.N.Y. June 10, 2009)..........21 n.6, 22, 25, 26

Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., Ltd.,
    No. 95 Civ. 4008 (AGS), 1995 WL 528001, at *7 (S.D.N.Y. Sept. 6, 1995) ........................13

Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,
    794 F.2d 38 (2d Cir. 1986)................................................................5

Clinique Labs., Inc. v DEP Corp.,
    945 F. Supp. 547 (S.D.N.Y. 1996) ....................................................14, 15

DC Comics v. Kryptonite Corp.,
    336 F. Supp. 2d 324 (S.D.N.Y. 2004)................................................8 n.2

Dan-Foam A/S v. Brand Named Beds, LLC,
    500 F. Supp. 2d 296 (S.D.N.Y. 2007)................................................25

Deere & Co. v. MTD Prods., Inc.,
    41 F.3d 39 (2d Cir. 1994)................................................................27 n.7

## TABLE OF AUTHORITIES
(continued)

**Page**

E. Gluck Corp. v. Rothenhaus,
   585 F. Supp. 2d 505 (S.D.N.Y. 2008)..................................................................6

Fruit-Ices Corp. v. Coolbrands Int'l, Inc.,
   335 F. Supp. 2d 412 (S.D.N.Y. 2004)..................................................................9

GTFM, Inc. v. Solid Clothing Inc.,
   215 F. Supp. 2d 273 (S.D.N.Y. 2002)......................................13, 20, 21, 30 n.9

Gucci Am., Inc. v. Curveal Fashion,
   No. 09 Civ. 8458(RJS), 2010 WL 308303 (S.D.N.Y. Jan. 20, 2010)......................6

Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.,
   No. 02 Civ. 0861 (LMM), 2002 WL 1543817 (S.D.N.Y. July 12, 2002) ..............10

Heisman Trophy Trust v. Smack Apparel Co.,
   595 F. Supp. 2d 320 (S.D.N.Y. 2009)..................................................................8, 9

Home Shopping Club, Inc. v. Charles of the Ritz Group, Inc.,
   820 F. Supp. 763 (S.D.N.Y. 1993) ....................................................................18

Kraft Gen. Foods, Inc. v. Allied Old English, Inc.,
   831 F. Supp. 123 (S.D.N.Y. 1993) ..........................................................19, 27 n.7

Les Ballets Trockadero De Monte Carlo, Inc. v. Trevino,
   945 F. Supp. 563 (S.D.N.Y. 1996) ....................................................................31

Lois Sportswear, U.S.A. v. Levi Strauss & Co.,
   799 F.2d 867 (2d Cir. 1986)..............................................................................17

Malletier v. Burlington Coat Factory Warehouse Corp.,
   426 F.3d, 532, 537 (2d Cir. 2005)......................................................................14

MetLife, Inc. v. Metro. Nat'l Bank,
   388 F. Supp. 2d 223 (S.D.N.Y. 2005)................................................................20

Nabisco, Inc. v. PF Brands, Inc.,
   50 F. Supp. 2d 188 (S.D.N.Y. 1999)..........................................................7, 25, 29

Natural Organics, Inc. v. Nutraceutical Corp.,
   426 F.3d 576 (2d Cir. 2005)..............................................................................9

# TABLE OF AUTHORITIES
(continued)

Page

NBA Props. v. Untertainment Records LLC,
   No. 99 Civ. 2933 (HB), 1999 WL 335147 (S.D.N.Y. May 26, 1999)......................................7

Pfizer Inc. v. Sachs,
   652 F. Supp. 2d 512 (S.D.N.Y 2009).....................................................17, 18, 19, 20

Philip Morris USA Inc. v. Cowboy Cigarette Inc.,
   No. 03 Civ. 2292 (JSR), 2003 WL 22852243, at *2 (S.D.N.Y. Dec. 2, 2003).........................9

Pocono Int'l Raceway, Inc. v. Pocono Mountain Speedway, Inc.,
   171 F. Supp. 2d 427 (M.D. Pa. 2001) .........................................................13

Polaroid Corp. v. Polarad Elecs. Corp.,
   287 F.2d 492 (2d Cir. 1961), cert. denied, 368 U.S. 820 (1961).........................9, 10

Reno Air Racing Ass'n, Inc. v. McCord,
   No. CV-N-02-0474 (HDM) (RAM), 2004 WL 3561191 (D.Nev. Mar. 9, 2004) ...................13

Rescuecom Corp. v. Google Inc.,
   562 F.3d 123 (2d Cir. 2009).................................................................8 n.2

Rodgers v. Wright,
   544 F. Supp. 2d 302 (S.D.N.Y. 2008)...........................................................14

Ryan v. Volpone Stamp Co.,
   107 F. Supp. 2d 369 (S.D.N.Y. 2000)..........................................................6, 7

Saban Entm't, Inc. v. 222 World Corp.,
   865 F. Supp. 1047 (S.D.N.Y. 1994)...........................................................5, 6

Simon & Schuster Inc. v. Dove Audio, Inc.,
   970 F. Supp. 279 (S.D.N.Y. 1997) .............................................................10

Sporty's Farm, L.L.C. v. Sportsman's Mkt., Inc.,
   202 F.3d 489 (2d Cir. 2000)..................................................................27, 28

Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.,
   823 F. Supp. 1077 (S.D.N.Y. 1993)..........................................17, 19, 29, 31

T. Anthony, Ltd. v. Malletier,
   No. 93 Civ. 6900(KC), 1993 WL 659682, at *3 (S.D.N.Y. Nov. 24, 1993) .........................13

**TABLE OF AUTHORITIES**
(continued)

Page

The Morningside Group Ltd. v. Morningside Capital Group, L.L.C.,
    182 F.3d 133 (2d Cir. 1999)....................................................................20

Thompson Med. Co. v. Pfizer, Inc.,
    753 F.2d 208 (2d Cir. 1985)....................................................................9

Tri-Star Pictures, Inc. v. Unger,
    14 F. Supp. 2d 339 (S.D.N.Y. 1998)....................................................12, 16, 29

Two Pesos v. Taco Cabana,
    505 U.S. 763 (1992)....................................................................8 n.2

Virgin Enters. Ltd. v. Nawab,
    335 F.3d 141 (2d Cir. 2003)....................................................4, 8, 9, 15, 16, 19

Vogster Entm't, L.L.C. v. Mostovoy,
    No. 09-CV-1036 (RRM) (RER), 2009 WL 691215 (E.D.N.Y. Mar. 16, 2009)...............27, 28

Weight Watchers Int'l, Inc. v. Luigino's, Inc.,
    423 F.3d 137 (2d Cir. 2005)....................................................................6

Zino Davidoff SA v. CVS Corp.,
    571 F.3d 238 (2d Cir. 2009)....................................................................4, 6

**FEDERAL STATUTES & RULES**

15 U.S.C. §§ 1125(a) .................................................... 4, 7, 8 & n.2, 9, 13, 21, 25, 29

15 U.S.C. § 1125(c) ....................................................7, 22, 23, 25, 26

15 U.S.C. § 1125(d) ....................................................7, 27, 28 n.8, 29

Federal Rule of Civil Procedure 65 ....................................................1, 32

**STATE STATUTES**

New York Gen. Business Law §349....................................................................30 n.9

New York Gen. Business Law §360-1 ....................................................................7, 27 n.7

Plaintiff The New York City Triathlon, LLC respectfully submits this memorandum of law in support of its motion for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, to prevent and restrain Defendant NYC Triathlon Club ("NYC Triathlon Club") from using "NYC Triathlon Club," "NYC Tri Club," and "New York City Triathlon Club" as names, trade names or trademarks, or as a domain name on the Internet, or in any other way that is likely to cause confusion with Plaintiff or its well-known trade name and trademarks, NEW YORK CITY TRIATHLON, NYC TRIATHLON, and NYC TRI (the "NYC TRIATHLON Marks").

## PRELIMINARY STATEMENT

Plaintiff New York City Triathlon, LLC is the owner of the NYC TRIATHLON Marks for use in connection with the operation of the New York City Triathlon ("NYC Triathlon"), an officially-sanctioned Olympic distance triathlon, where participants swim, bike, and run through the rivers, streets, and parks of New York City. The NYC Triathlon is in its tenth year of operation, and Plaintiff has used its NYC TRIATHLON Marks exclusively in connection with the race since its inception. Through significant media attention and publicity, and due to Plaintiff's emphasis on running a high quality event and providing customer service second-to-none, the NYC Triathlon has become one of the most recognized and well-respected triathlons in the United States and the world. Despite Plaintiff's ten years of established use in the marketplace, Defendant, a former sponsor of the NYC Triathlon, in a blatant attempt to trade on the NYC Triathlon's well-known name and goodwill, recently announced that it was changing its name from "SBR Triathlon Club" to "NYC Triathlon Club." Plaintiff brings this action, seeking preliminary and permanent injunctive relief, as well as damages, to prevent the immediate and irreparable harm to Plaintiff resulting from the NYC Triathlon Club's unauthorized and unlawful use of the NYC TRIATHLON Marks. Such relief is warranted, as

Defendant's acts are likely to cause confusion, mistake or deception among the consuming

public, and as such are in direct violation of Section 43 of the Lanham Act, as well as applicable

New York common and statutory law.

## STATEMENT OF FACTS[1]

The NYC Triathlon is an Olympic distance triathlon, consisting of a 1500 meter

swim in the Hudson River, a 40 kilometer bike ride up the West Side Highway and a ten

kilometer run into Central Park.  V. Compl. ¶¶ 7, 8; Korff Decl. ¶ 8.  It has been run every

summer in New York City since 2001 and Plaintiff has, since that date, exclusively used its well-

known name and mark THE NEW YORK CITY TRIATHLON (and its related variations, THE

NYC TRIATHLON and THE NYC TRI) in connection with the event.  V. Compl. ¶¶ 1, 35, 67;

Korff Decl. ¶ 42.  The race is enormously successful and has grown exponentially since its first

run in 2001.  This year over 20,000 people vied for the 5600 entry spots, and they sold out in

under seven minutes after registration opened online.  V. Compl. ¶ 21; Korff Decl. ¶ 27.  It is

estimated that 250,000 people come out to watch the race.  V. Compl. ¶ 21; Korff Decl. ¶ 11.

Plaintiff has been singularly devoted to customer service since the very first race

in 2001 and its efforts have paid off.  V. Compl. ¶¶ 33, 18; Korff Decl. ¶¶ 14, 28, 40.  The race

has developed a loyal and enthusiastic following.  V. Compl. ¶¶ 20, 21, 34; Korff Decl. ¶¶ 27,

41.  Thousands of participants have e-mailed John Korff, Plaintiff's principal owner and

organizer of the race, to praise the race and to praise Plaintiff's organization and attention to

detail.  V. Compl. ¶ 34; Korff Decl. ¶ 41.  To run a race of this scope and kind, Plaintiff must

obtain approvals from over 40 different city and state agencies.  V. Compl. ¶ 8; Korff Decl. ¶ 9.

In addition, Plaintiff employs 200 people during the week of the race, hires countless additional

---

[1] The facts underlying this motion, summarized here, are set forth in full in Plaintiff's Verified Complaint, dated February 22, 2010 ("V. Compl.") and in the Declaration of John Korff, dated February 22, 2010 ("Korff Decl.")

independent contractors to handle everything from devising an emergency service plan, to building the entrance into and out of the Hudson River, to making plans for accommodating the many disabled athletes who participate, and also engages a team of 1000 volunteers to ensure the success of the race. V. Compl. ¶ 24; Korff Decl. ¶ 12. The NYC Triathlon is sanctioned by USA Triathlon ("USAT"), the independent organization that governs triathlon racing in the United States, and as such, adheres to certain safety guidelines and certifications. V. Compl. ¶ 9; Korff Decl. ¶ 10. Because of Plaintiff's attention to detail and safety, the race attracts a diverse field of participants, ranging from elite racers to first time triathletes to physically disabled athletes. V. Compl. ¶ 24, 33; Korff Decl. ¶ 11.

Plaintiff's huge success has not gone unnoticed by the press. The NYC Triathlon has been covered by numerous news and media outlets, including ABC, NBC, CBS, FOX, CNN, WOR, BBC, WFAN, The New York Times, The Wall Street Journal, USA Today, and the Associated Press. V. Compl. ¶¶ 14, 16; Korff Decl. ¶¶ 16, 20, 21, 22. It has received local coverage in nearly every U.S. State and has also received international media coverage in countries such as Australia, India, and Great Britain. V. Compl. ¶¶ 14, 16; Korff Decl. ¶¶ 20, 21. The event itself, through its broadcast coverage, has been viewable by over 60 million people in the United States and over a billion worldwide. V. Compl. ¶ 14; Korff Decl. ¶ 16. With this level of media coverage, it is no surprise that numerous well-known and famous brands have joined the team as sponsors of the event over the years. Nautica is currently the principal sponsor, and corporations such as Ford Motor Company, Marriott Hotels, Gatorade, JetBlue, Visa, Dasani, Delta Airlines, Accenture, News Corp. (which owns The Wall Street Journal and Fox Broadcasting Company), Toyota, and Janus Capital Group have all sponsored or currently sponsor the race. V. Compl. ¶¶ 13, 16; Korff Decl. ¶¶ 15, 26.

3

Defendant is fully aware of Plaintiff and the NYC Triathlon's success and goodwill. Its affiliated company, SBR Multisports, Inc. ("SBR"), a retail outlet selling triathlon equipment, owned and operated by Defendant's principal owner, Christophe Vandaele ("Vandaele"), was itself a sponsor of the NYC Triathlon from 2005-2008 and took a booth at the race Expo in 2009. V. Compl. ¶¶ 39, 41; Korff Decl. ¶ 45. Rather than continue to sponsor Plaintiff's event (and pay the required fee for that affiliation), Defendant appears to have decided to simply take Plaintiff's name for itself. By press release dated January 25, 2010, Defendant announced that effective January 1, 2010, it was changing its name from "SBR Triathlon Club" to "NYC Triathlon Club." V. Compl. ¶¶ 45, 56; Korff Decl. ¶ 52. There appears to be no other reason for the recent selection of this name by Defendant other than to improperly trade off of the goodwill and reputation of Plaintiff. Given the likely confusion to consumers, participants, sponsors and the media, Plaintiff sent Defendant a cease and desist letter dated January 8, 2010 seeking a response by January 15, 2010. V. Compl. ¶ 54; Korff Decl. ¶ 51. Receiving no response, Plaintiff commenced this action, seeking injunctive relief to protect its name and goodwill pursuant to Section 43(a) of the Lanham Act and the common and statutory laws of New York. V. Compl. ¶ 1.

## ARGUMENT

## NYC TRIATHLON IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF

To obtain a preliminary injunction, the party seeking the injunction must demonstrate (1) a likelihood of irreparable injury in the absence of an injunction, and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of the hardships tipping decidedly toward the party requesting the injunction. *See Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 242 (2d Cir. 2009); *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir. 2003). As demonstrated

below, Plaintiff NYC Triathlon satisfies this standard under either test and is entitled to injunctive relief to prevent Defendant from further trading on Plaintiff's goodwill.

## I.   DEFENDANT'S UNLAWFUL ACTS ARE CAUSING IMMEDIATE AND IRREPARABLE HARM TO NYC TRIATHLON

The harm to Plaintiff as a result of Defendant's use of the "NYC Triathlon Club" name is both immediate and irreparable and will continue unless enjoined. As noted above and in detail in the Korff Declaration, Plaintiff has invested substantial and unprecedented efforts into making the NYC Triathlon not only a financially successful venture, but one that is well-known, loved by the participants and respected as a premiere international racing event. V. Compl. ¶¶ 18, 19, 30; Korff Decl. ¶¶ 25, 38. Plaintiff has amassed substantial goodwill and a very favorable reputation during its ten years of operation. V. Compl. ¶¶ 20, 34; Korff Decl. ¶ 28.

By misappropriating Plaintiff's trade name and the NYC TRIATHLON Marks, Defendant is not only trading on Plaintiff's earned goodwill, but also is taking from Plaintiff the ability to control its reputation and the services offered under its name and mark. This harm cannot be quantified and is irreparable. Every day that Defendant operates with Plaintiff's name, the ability of Plaintiff to signify its services and its reputation by its NYC TRIATHLON Marks is lessened.

It is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard. *See Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir. 1986) ("[I]rreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial.") (citations omitted); *Saban Entm't, Inc. v. 222 World Corp.*, 865 F. Supp. 1047, 1056 (S.D.N.Y.

1994) ("[R]eputational erosion is sufficient to support a finding of irreparable harm."); *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 136 (S.D.N.Y. 1993) ("[T]he loss of goodwill and reputation . . . simply cannot be compensated adequately by an award of money damages") (citation omitted).

Plaintiff is also entitled to a presumption of irreparable harm in this case.  It has been held consistently and repeatedly in the Second Circuit that where there is likely confusion in an action for trademark infringement, the requisite irreparable harm is established as a matter of course.  *See Zino Davidoff SA*, 571 F.3d at 246-47 (a "plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury.") (citation omitted); *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) (affirming district court's finding that plaintiff had established a likelihood of confusion and was entitled to presumption of irreparable harm); *Gucci Am., Inc. v. Curveal Fashion*, No. 09 Civ. 8458(RJS), 2010 WL 308303, at *2 (S.D.N.Y. Jan. 20, 2010) (noting that "in a trademark case, irreparable injury is established where there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.") (quotation omitted); *E. Gluck Corp. v. Rothenhaus*, 585 F. Supp. 2d 505, 519 (S.D.N.Y. 2008) (granting preliminary injunction and noting that in the preliminary injunction context, "where the plaintiff has a protected mark, a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm") (quotation omitted).

A presumption of irreparable harm also flows from a finding of likely dilution. *See Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 404 (S.D.N.Y. 2000) ("The probability of serious dilution in the value of the marks by any unauthorized use on the part of defendants

provides an adequate basis for a finding of irreparable injury.") (quotation omitted); *NBA Props.*

*v. Untertainment Records LLC*, No. 99 Civ. 2933 (HB), 1999 WL 335147, at *6 (S.D.N.Y. May

26, 1999) ("The irreparable harm test is met under section 43(c) [of the Lanham Act] where there

is a likelihood of dilution."); *Nabisco, Inc. v. PF Brands, Inc.*, 50 F. Supp. 2d 188, 197 (S.D.N.Y.

1999) ("dilution is itself an injury which cannot be recompensed by money damages. . . . A

showing of a likelihood of dilution, therefore, will establish irreparable harm under Section

43(c).") (quotations and citations omitted).

        As established below, Plaintiff is entitled to a presumption of irreparable harm

due to its likely success on both its 43(a) and its dilution claims.

## II.     NYC TRIATHLON IS LIKELY TO SUCCEED
##         ON THE MERITS OF ITS CLAIMS

        The Verified Complaint sets forth seven counts arising out of Defendant's

infringing use of "NYC Triathlon Club" as a name and domain name:  (1) trademark

infringement, false designation of origin and unfair competition pursuant to section 43(a) of the

Lanham Act (15 U.S.C. § 1125(a)); (2) dilution pursuant to section 43(c) of the Lanham Act (15

U.S.C. § 1125(c)); (3) cybersquatting pursuant to section 43(d) of the Lanham Act (15 U.S.C. §

1125(d)); (4) common law trademark infringement under New York State law; (5) dilution

pursuant to New York General Business Law § 360-l; (6) violation of New York General

Business Law § 349, New York's deceptive acts and practices statute; and (7) unfair competition

pursuant to the common law of New York.  As demonstrated below, based upon the application

of settled law to the undisputed facts, Plaintiff is likely to succeed on the merits of each of its

claims.

### A.    NYC Triathlon is Likely to Prevail on its Lanham Act §43(a) Claim

Section 43(a) of the Lanham Act expressly prohibits the use in commerce of any word, term, name, symbol, or device (or any false designation of origin) that is:

> likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

15 U.S.C. §§ 1125(a)(1) and (a)(1)(A) (2009).[2]  To state a claim under Section 43(a), a plaintiff must show it has a valid trademark entitled to protection and that the defendant's mark is likely to cause confusion in the marketplace.  *See Virgin Enters.*, 335 F.3d at 146; *Heisman Trophy Trust v. Smack Apparel Co.*, 595 F. Supp. 2d 320, 325 (S.D.N.Y. 2009).  The Second Circuit has articulated eight factors (often referred to as "the *Polaroid* factors") to be considered when assessing the likelihood of consumer confusion:

(1)    the strength of the plaintiff's mark;

(2)    the similarity of the plaintiff's and defendant's marks;

(3)    the competitive proximity of the products or services;

(4)    the likelihood that the plaintiff will "bridge the gap" and offer a product or service similar to the defendant's;

(5)    actual confusion between the products or services;

(6)    good faith on the defendant's part;

(7)    the quality of the defendant's products or services; and

(8)    the sophistication of buyers.

---

[2] Section 43(a) protects both registered and unregistered marks. *See Two Pesos v. Taco Cabana*, 505 U.S. 763, 768 (1992) ("[I]t is common ground that § 43(a) protects qualifying unregistered trademarks."); *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 128 n.3 (2d Cir. 2009) (citing *Two Pesos*); *DC Comics v. Kryptonite Corp.*, 336 F. Supp. 2d 324, 331 (S.D.N.Y. 2004) (citing Section 43(a) and noting that it "protects both registered and unregistered marks. . . .").

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), *cert. denied*, 368 U.S.

820 (1961). *See also Virgin Enters.*, 335 F.3d at 146-47; *Heisman Trophy*, 595 F. Supp. 2d at

326. The factors apply to competing and non-competing goods and services, and no single factor

is intended to be dispositive. *See Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576,

578 (2d Cir. 2005); *Fruit-Ices Corp. v. Coolbrands Int'l, Inc.*, 335 F. Supp. 2d 412, 418-19

(S.D.N.Y. 2004). Since the analysis used to determine the first prong of a claim under §43(a) –

whether a trademark is valid and entitled to protection – overlaps with the analysis generally

used to assess the first *Polaroid* factor – *i.e.*, strength of the mark – the strength and

protectability of Plaintiff's NYC TRIATHLON Marks are discussed together below.

> **1.    The NYC TRIATHLON Marks are Strong,**
> **Having Acquired Secondary Meaning**

Since the NYC TRIATHLON Marks fall into the descriptive category on the

*Abercrombie* continuum,[3] they must have "secondary meaning," *i.e.*, the ability to signify

Plaintiff as the exclusive source of the services at issue to an appreciable number of consumers,

in order to be protectible. There is no question that the NYC TRIATHLON Marks, through ten

years of continuous and exclusive use, have attained this level of consumer recognition and have

come to be strong signifiers of Plaintiff and its triathlon services. In determining whether a mark

has acquired secondary meaning, the Second Circuit has set forth a number of factors that can be

considered: 1) advertising expenditures; 2) sales success; 3) unsolicited media coverage of the

product; 4) attempts to plagiarize the mark; 5) the length and exclusivity of the mark's use; and

6) consumer studies linking the name to a source. *See Thompson Med. Co. v. Pfizer, Inc.*, 753

F.2d 208, 217 (2d Cir. 1985); *see also Philip Morris USA Inc. v. Cowboy Cigarette Inc.*, No. 03

---

[3] The Second Circuit's *Abercrombie*'s continuum to determine the validity of a mark finds at one end, fanciful and arbitrary marks such as KODAK and XEROX and at the other, generic terms, such as MILK for milk. Descriptive and suggestive marks fall in between those two extremes. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)

Civ. 2292 (JSR), 2003 WL 22852243, at *2 (S.D.N.Y. Dec. 2, 2003); *Simon & Schuster Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 294 (S.D.N.Y. 1997). "[N]o single factor among the six is determinative, and every element need not be proved." *Simon & Schuster*, 970 F. Supp. at 295 (citations omitted).

The length and exclusivity of Plaintiff's use of the NYC TRIATHLON Marks compels a finding of secondary meaning here. This year the NYC Triathlon is celebrating its tenth anniversary as the only Olympic distance triathlon to be run in the rivers, streets, and parks of New York City. V. Compl. ¶ 7; Korff Decl. ¶ 27. During the NYC Triathlon's ten years of existence, Plaintiff has been the exclusive user of the NYC TRIATHLON Marks. V. Compl. ¶ 1; Korff Decl. ¶ 42. Plaintiff has also been extremely protective of the exclusivity and use of its marks, requiring all sponsors to seek its written approval before using the NYC TRIATHLON Marks on any goods, services, or literature they publish or distribute and policing unauthorized uses of its marks. V. Compl. ¶ 28; Korff Decl. ¶ 34. To further protect its exclusive rights to its marks, Plaintiff has filed trademark applications for its NYC TRIATHLON Marks within the United States Patent & Trademark Office. V. Compl. ¶ 38; Korff Decl. ¶ 43. Those applications are pending.

With respect to sales and financial success, the NYC Triathlon is unparalleled among events of its kind. The race itself regularly sells out within minutes of entry slots being made available online. V. Compl. ¶ 7. For the 2010 race, all 5,600 entry spots were gone in a record-setting six minutes and 43 seconds, with over 20,000 people trying to enter the race. V. Compl. ¶ 21; Korff Decl. ¶ 27. In addition, the race has approximately 250,000 spectators. V. Compl. ¶ 21; Korff Decl. ¶ 11. Plaintiff also grosses millions of dollars in revenue per year from entry sales. V. Compl. ¶ 30; Korff Decl. ¶ 38. To put this in perspective, the NYC

Triathlon's revenue from entry spot sales is 50% greater than the nation's second largest

Olympic distance triathlon and ten times greater than any other race of its kind. V. Compl. ¶ 30;

Korff Decl. ¶ 38. Plaintiff also receives an unprecedented amount of revenue from a group of

well-known and established sponsors, such as Ford Motor Company, Nautica, Gatorade, JetBlue,

Dasani, News Corp. (which owns the FOX Broadcasting Company and The Wall Street Journal),

further evidencing the strength of the NYC TRIATHLON Marks. V. Compl. ¶¶ 13, 16; Korff

Decl. ¶¶ 15, 26. Its sponsorship revenue from those sponsors is twenty times greater than the

average Olympic distance triathlon. V. Compl. ¶ 30; Korff Decl. ¶ 38.

      The strength of Plaintiff's Marks is further evidenced by the vast media coverage

that the event receives. The USAT-sanctioned event has been covered on national and local

television stations and networks such as CNN, NBC, CBS, ABC, FOX, SNY, the Outdoor Life

Network (now known as Versus), New York City's local network affiliates, and the BBC; on

radio stations such as WFAN and Z-100; in print publications such as the front page of The New

York Times, The New York Post, USA Today, the Associated Press, and all major triathlon

magazines; and on its own website, www.nyctri.com. V. Compl. ¶¶ 14, 15, 16; Korff Decl.

¶¶ 16, 17, 20, 21, 22. This coverage is truly national. In fact, the event has received local

coverage in nearly every U.S. state. V. Compl. ¶ 16; Korff Decl. ¶ 21. The NYC Triathlon is

also promoted by the race's sponsors, such as News Corp., the owner of the FOX Network and

of The Wall Street Journal, and Reebok. V. Compl. ¶¶ 17, 29; Korff Decl. ¶ 36.

      Plaintiff's relentless attention to the participants and customer service also

contributes significantly to the NYC TRIATHLON Marks' consumer recognition. After

registration, Korff personally e-mails each registrant to welcome them to the race. Korff Decl.

¶ 28. The e-mails Korff receives, though, truly signify the Marks' goodwill and the secondary

meaning they have earned.  Thousands of people have e-mailed Plaintiff praising the race and

Plaintiff as the source and organizer of the race, writing, for example, "I'm extremely proud to

be associated with such a world class event" and "the NYC Triathlon, like the NYC Marathon,

has become one of the great events that is recognized World Wide." V. Compl. ¶ 34.  Plaintiff's

staff also engages in a meticulous and time-consuming process of identifying the continually-

changing and unlisted roster of the presidents of the approximately four hundred triathlon clubs

registered with USA Triathlon ("USAT") (the official governing body of triathlon in the United

States), and communicating with them so that those presidents and their clubs will know of the

race and Plaintiff as the source of the race.  V. Compl. ¶ 18; Korff Decl. ¶ 25.  It is Plaintiff's

belief that no other Olympic distance triathlon undertakes such an extensive grassroots

community outreach campaign.  V. Compl. ¶ 18; Korff Decl. ¶ 25.

Finally, Defendant's theft of the NYC TRIATHLON Marks provides further

evidence of their secondary meaning. *See Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339,

351 (S.D.N.Y. 1998) ("[A]ttempts to plagiarize a mark is the most persuasive, if not conclusive,

factor in favor of finding secondary meaning.").  Having sponsored the NYC Triathlon for

several years, Defendant's principal, Vandaele, and his company SBR, were fully familiar with

Plaintiff's event and its unqualified prominence and worldwide success.  V. Compl. ¶ 41; Korff

Decl. ¶ 45.  Wishing to profit from the NYC Triathlon's success, Vandaele, upon ceasing his

sponsorship relationship with the NYC Triathlon, recently renamed his club from the "SBR

Triathlon Club" to the "NYC Triathlon Club" so as to suggest some affiliation with Plaintiff and

trade on Plaintiff's goodwill.  Korff Decl. ¶¶ 51, 52, 57.  Defendant's misappropriation of

Plaintiff's name for his own club is a testament to Plaintiff's success and further proof of the

secondary meaning in Plaintiff's Marks.

Given the great success of the NYC Triathlon, the extensive media coverage, and the strong reputation Plaintiff has developed among consumers, Plaintiff's NYC TRIATHLON Marks have most certainly obtained secondary meaning and can be considered strong marks.[4] *GTFM, Inc. v. Solid Clothing Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002) (granting plaintiff injunctive relief and noting that "[s]econdary meaning exists where the public is moved in any degree to buy an article because of its source.") (quotation omitted); *see Reno Air Racing Ass'n, Inc. v. McCord*, No. CV-N-02-0474 (HDM) (RAM), 2004 WL 3561191, at *4-5 (D. Nev. Mar. 9, 2004) (holding that "Reno Air Races," used in connection with an air racing event, had acquired secondary meaning); *Pocono Int'l Raceway, Inc. v. Pocono Mountain Speedway, Inc.*, 171 F. Supp. 2d 427, 439-40 (M.D. Pa. 2001) (finding secondary meaning for "Pocono Raceway" and "Pocono" as used in connection with an auto racing event and raceway).

Given their strong secondary meaning, the NYC TRIATHLON Marks are valid trademarks deserving of protection, satisfying the first element of a claim under Section 43(a) of the Lanham Act, and strong marks, providing persuasive support for a finding of likely confusion under the first *Polaroid* factor. *See Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., Ltd.*, No. 95 Civ. 4008 (AGS), 1995 WL 528001, at *7 (S.D.N.Y. Sept. 6, 1995) (granting preliminary injunction and noting, "[t]he strength of a mark is among the most important factors in the *Polaroid*" analysis) (citation omitted); *T. Anthony, Ltd. v. Malletier*, No. 93 Civ. 6900 (KC), 1993 WL 659682, at *3 (S.D.N.Y. Nov. 24, 1993) (same).

---

[4] Plaintiff's NYC TRIATHLON Marks have also become famous, further attesting to their strength. *See infra* Part II.B.1.

### 2.    The NYC Tri Club Marks are Nearly Identical to the NYC TRIATHLON Marks

The similarity between Defendant's "NYC Triathlon Club" and the NYC TRIATHLON Marks is obvious.  When assessing the similarity of two names or marks, courts "analyze the mark[s'] overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d, 532, 537 (2d Cir. 2005) (quotation omitted).  "[M]arks are considered similar when they are similar in appearance, sound, and meaning." *Clinique Labs., Inc. v DEP Corp.*, 945 F. Supp. 547, 552 (S.D.N.Y. 1996) (citation omitted).

The central and important part of each of the marks at issue is identical in appearance, sound, and meaning – the words "New York City Triathlon," "NYC Triathlon," and "NYC Tri."  Defendant's addition of the word "Club" does not change the emphasis on "NYC Triathlon" (and its aforementioned derivations) as the operative part of the mark.  In fact, the addition of the word "Club" suggests that Plaintiff has launched its own club in conjunction with its signature event.  "It is the general rule that one may not appropriate the entire mark of another and avoid a likelihood of confusion by the addition thereto of descriptive or otherwise subordinate matter." *Bellbrook Dairies, Inc. v. Hawthorn-Mellody Farms Dairy, Inc.*, 253 F.2d 431, 432 (C.C.P.A. 1958) ("Vita-Slim" confusingly similar to "Slim") (citations omitted); *see also A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir. 1972) (finding addition of "by Bradley" did not prevent confusion between plaintiff's protected "Cross" pens and defendant's "LaCross by Bradley" pens); *Rodgers v. Wright*, 544 F. Supp. 2d 302, 311 (S.D.N.Y. 2008) (defendants' spin-off musical group "First Ladies of Chic" was confusingly similar to original "Chic"); *Am. Express Co. v. Am. Express Limousine Serv.*, 772 F. Supp. 729,

733 (E.D.N.Y. 1991) (finding the defendant's addition of "Limousine Services" to the plaintiff's "American Express" mark enhanced rather than dispelled confusion). Since Defendant's addition of the word "Club" to the NYC TRIATHLON Marks does little to dispel likely confusion, and in fact enhances the likelihood that consumers will assume an affiliation or sponsorship, this factor too weighs strongly in favor of a finding of likely confusion.

### 3.      NYC Triathlon's Services are in Close Competitive Proximity to Defendant's Services and Plaintiff Has Already Bridged Any Gap

The next two *Polaroid* factors to be considered are competitive proximity of the services offered under the NYC TRIATHLON Marks and by the NYC Triathlon Club and the intent of Plaintiff to "bridge the gap" between the two, to the extent they are not already offering the same services. The proximity inquiry looks both to the nature of the services and the structure of the relevant market and includes consideration of "the class of consumers to whom the goods are sold, the manner of advertising, the channels through which the goods are sold, and the extent to which the goods or services fall within the same class or are used together." *Clinique Labs.*, 945 F. Supp. at 553 (citations omitted). Thus, "the closer the secondary user's goods [or services] are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." *Virgin Enters.*, 335 F.3d at 150 (citation omitted).

Here, Plaintiff and Defendant clearly operate in the same channels of trade. The individuals they service are exactly the same – those seeking to participate and train for an endurance sporting event. The sponsors are also the same – sponsors of the race, sports drinks, bottled water, and equipment manufacturers, for example, are the very same sponsors that triathlon clubs seek for sponsorships. Indeed, Defendant has indicated on its website that it is actively engaged in seeking such sponsorships. V. Compl. ¶¶ 51, 54; Korff Decl. ¶ 56. Not only

are the parties' services marketed to the same exact individuals and organizations, there is also no dispute that the services of a triathlon race and a club which helps competitors prepare for triathlon races are "used together." Both parties also primarily receive "customers" online. V. Compl. ¶¶ 15, 48, 50; Korff Decl. ¶¶ 24, 25. Further, given the popularity of the NYC Triathlon and the ubiquity of triathlon clubs, there is a distinct likelihood that triathletes and sponsors will assume that Plaintiff has commissioned a triathlon club in its name. This is especially likely for a race occurring in the New York City area, where the New York City Marathon, another distinguished racing event held in the City, has been owned and operated by a running club, the New York Road Runners, for approximately forty years. Moreover, placing Plaintiff and Defendant in even closer proximity, Plaintiff has begun associating the NYC TRIATHLON Marks with a training club through its relationship with Reebok. *See* V. Compl. ¶ 29; Korff Decl. ¶ 36.[5]

   "Bridging the gap" is closely related to the proximity of the products factor. This factor examines "whether the senior user of the mark is likely to enter the market in which the junior user is operating." *Tri-Star*, 14 F. Supp. 2d at 356 (citation omitted). For this factor, courts examine "the likelihood that, even if the plaintiff's products were not so close to the defendants' when the defendant began to market them, there was already a likelihood that plaintiff would in the reasonably near future begin selling those products." *Virgin Enters.*, 335 F.3d at 150. Since Plaintiff and Defendant are already operating in the same channel of trade, this factor is already satisfied. In addition, Plaintiff has expressly considered creating a formal, USAT-registered triathlon club whose name would bear the NYC TRIATHLON Marks and operate similarly to how New York Road Runners operates with regard to the NYC Marathon.

---

[5] Plaintiff also already operates the NYC Triathlon Club Championship ("NYC Tri Club Championship") as part of the NYC Triathlon (a fact of which Defendant is fully aware, as Defendant's affiliate, SBR, sponsored this event). This fact compounds the likelihood of confusion.

Korff Decl. ¶ 38.  Plaintiff's pursuit of this plan, however, has been derailed due to Defendant's misappropriation and the likely consumer confusion that would stem from multiple triathlon clubs bearing the names "NYC Triathlon" or "NYC Tri."

These factors thus also strongly favor a finding of likely confusion.

### 4.   Evidence of Actual Confusion Exists

The *Polaroid* test's fifth factor, evidence of actual confusion, also favors Plaintiff. "[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois Sportswear, U.S.A. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986); *see also Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 523 (S.D.N.Y 2009) (same).  This is particularly true when an infringing product or service has been on the market for only a short time.  *See Pfizer*, 652 F. Supp. 2d at 523 ("The absence of proof of actual confusion is not fatal to a finding of likelihood [of confusion], particularly where, as here, the junior mark has been in the marketplace for a relatively short period of time.") (quotation omitted); *Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*, 823 F. Supp. 1077, 1087 (S.D.N.Y. 1993) ("It would be unfair to penalize plaintiff for acting to protect [its] trademark rights before serious damage has occurred.") (quoting *Lois Sportswear*, 799 F.2d at 875).

Despite the fact that Defendant's press release announcing the formation of the NYC Triathlon Club issued only on January 25, 2010, actual confusion as to whether Plaintiff owns and operates the club has already arisen.  On or about December 23, 2009, Korff received an e-mail from the president of the Westchester Triathlon Club, who indicated that he "got an email about the NYC tri club [sic].  It looks great."  V. Compl. ¶ 60; Korff Decl. ¶¶ 49, 50. Under the belief that Plaintiff owned and operated the NYC Triathlon Club, the sender requested that Korff add a particular triathlon to the NYC Triathlon Club's team schedule.  V. Compl. ¶ 60;

17

Korff Decl. ¶ 50. In light of this e-mail, it is safe to assume that others have been confused by Defendant's use of the NYC TRIATHLON Marks and Plaintiff's trade name. It is also likely that this confusion will persist as Defendant continues to promote itself using the NYC Triathlon Club name. *See, e.g.*, *Home Shopping Club, Inc. v. Charles of the Ritz Group, Inc.*, 820 F. Supp. 763, 774 (S.D.N.Y. 1993) ("[T]he presence of past or present confusion supports, logically enough, a conclusion of future confusion, and has been recognized by the Second Circuit as an important factor in determining its likelihood."). As such, the "actual confusion" factor also favors a finding of likely confusion.

### 5.   Defendant Lacks Good Faith

The next factor, which considers whether Defendant was operating in good faith when selecting its name or mark, considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill, and any confusion between his and the senior user's product. The defendant's awareness of plaintiff's mark may give rise to an inference of bad faith, which is bolstered if the defendant offers no credible explanation for its adoption of the mark." *Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442, 452 (S.D.N.Y. 2008) (citation omitted); *see also Pfizer*, 652 F. Supp. 2d at 523 (noting that defendants were aware of plaintiff's marks and that defendants refused to comply with plaintiff's cease-and-desist letters).

Defendant's bad faith is apparent here. After operating for a number of years as SBR and SBR Triathlon Club, and serving as a sponsor of Plaintiff's event, Defendant decided that rather than pay a sponsorship fee to be affiliated with Plaintiff, it would simply change its name to Plaintiff's name. V. Compl. ¶ 45; Korff Decl. ¶ 49. As such, there is no question that Defendant was aware of Plaintiff's marks and it is evident that Defendant's clear intention was and is to capitalize on Plaintiff's reputation and goodwill by fostering confusion between his club

and Plaintiff's triathlon services. This intent is made further evident by Defendant's failure to respond to Plaintiff's cease and desist letter. V. Compl. ¶ 55; Korff Decl. ¶¶ 51, 52. This appears to be a pattern for Defendant, as it has in bad faith attempted to trade on the goodwill of other famous sporting events in the past. Specifically, Defendant attempted to hold a race it referred to as the "Iron Race," trying to create some affiliation with the famous Ironman® triathlon mark. After receiving a cease and desist letter from the owner of the Ironman® mark, the race was cancelled. V. Compl. ¶ 52; Korff Decl. ¶ 53. This factor clearly weighs in favor of finding likely confusion. *See Kraft*, 831 F. Supp. at 132 ("When a company appropriates an identical mark that is well known and has acquired a secondary meaning, an inference can be drawn that the company intends to capitalize on the goodwill and reputation of the mark . . . ."); *Stern's Miracle-Gro*, 823 F. Supp. at 1087 (same).

### 6.     Defendant Offers Low Quality Services

This *Polaroid* factor "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Pfizer*, 652 F. Supp. 2d at 523 (quotation omitted). Here, "the quality of the secondary user's product goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion." *Virgin Enters.*, 335 F.3d at 152.

There is certainly a strong risk here that Defendant's use of Plaintiff's name and Marks will harm Plaintiff's reputation. Defendant has a pattern of sub-par business practices and poor customer support. For example, on at least one occasion, Defendant misused Plaintiff's brand by selling merchandise bearing the NYC TRIATHLON Marks without Plaintiff's approval. *See* V. Compl. ¶ 42; Korff Decl. ¶ 46. In addition, as another example, during the 2009 NYC Triathlon, SBR (an Expo participant that year) advertised a raffle, whose proceeds went to charity, to be held in its physical store. Korff Decl. ¶ 47. SBR stated that the winner of

the raffle would receive various triathlon gear, such as running shorts and a pair of shoes. *Id.* For months the winner attempted to collect his prize with no response from SBR. *Id.* After repeated futile attempts to collect, the winner of the raffle contacted Korff to inform him of SBR's poor customer service. *Id.* In an e-mail to Korff describing his mistreatment at the hands of SBR, the winner of the raffle stated, "The bottom line is that [SBR] treated me like dirt cause I wasn't in there to buy a $6000 bike. Then they ignored me for months when I was trying to follow up." *Id*; *see also* Exhibit W to Korff Decl. As another example, Defendant's "Iron Race" was going to proceed with no safety precautions or staff in place. Korff Decl. ¶ 53. This kind of customer service is the antithesis of Plaintiff's business model, which prides itself on exceeding all other races with respect to the racers' needs and safety. Any association with this kind of poor service would absolutely jeopardize Plaintiff's highly regarded and longstanding reputation.

### 7.     **The Sophistication of Consumers Fosters Confusion**

The *Polaroid* test's final factor analyzes the level of sophistication of consumers in the relevant market. *See MetLife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d 223, 235 (S.D.N.Y. 2005); *GTFM*, 215 F. Supp. 2d at 298 ("A trial court must consider the general impression of the ordinary consumer, buying under normal market conditions and giving the attention such purchasers usually give in purchasing the product at issue."). Even sophisticated consumers may be confused when two parties' marks and services are highly similar. *See The Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 143 (2d Cir. 1999) ("Indeed [the Second Circuit] has noted that the market sophistication might in some circumstances increase the likelihood of confusion. . . . It is clear in all events that when, as here, there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion.") (quotation and citation omitted); *Pfizer*, 652 F. Supp. 2d at 524 ("even a highly sophisticated and discriminating class of

consumers cannot be relied upon to allay confusion when the marks . . . are nearly identical.") (quotation omitted).

In this case, the relevant market ranges from elite professionals to amateurs looking to compete in their first triathlon. Indeed, a majority of the registrants (56%) for the 2010 NYC Triathlon have identified themselves as first-time triathletes. Korff Decl. ¶ 11. It has been held that confusion is especially likely for "unsophisticated buyers." *See Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.*, No. 02 Civ. 0861 (LMM), 2002 WL 1543817, at *6 (S.D.N.Y. July 12, 2002) (noting that unsophisticated buyers increase the likelihood of confusion) (quotation omitted). But here, even sophisticated triathletes are likely to be confused due to the similarity of the marks, as demonstrated by the e-mail Korff received from the president of the Westchester Triathlon Club. In his e-mail, the president, a sophisticated veteran of the triathlon community, indicated he has run the Westchester Triathlon Club for thirteen years and yet he was confused, assuming that Plaintiff had formed Defendant's club. *See* V. Compl. ¶ 60; Korff Decl. ¶ 50. This last *Polaroid* factor thus also favors likely confusion. *See GTFM*, 215 F. Supp. 2d at 297 (finding that professional buyers' documented confusion "speaks volumes about the likely confusion of less informed consumers.").

Overall, all eight of the *Polaroid* factors weigh in favor of a finding of likely confusion. As a result, Plaintiff is likely to succeed on the merits of its claim under §43(a) of the Lanham Act.[6]

---

[6] Since the elements of Plaintiff's New York common law infringement claim mirror those of the Lanham Act, Plaintiff is also likely to prevail on its common law trademark infringement claim (Count IV). *See Burberry Ltd. and Burberry USA v. Designers Imports, Inc.*, No. 07 Civ. 3997 (PAC), 2010 WL 199906, at *8 (S.D.N.Y. Jan 19, 2010); *GTFM, Inc*, 215 F. Supp. 2d at 300.

**B.**     **Plaintiff is Also Likely to Succeed on its Federal Claim for Dilution**

Defendant's use of "NYC Triathlon Club" has also diluted Plaintiff's NYC

TRIATHLON Marks.  The Trademark Dilution Revision Act of 2006 ("TDRA"), 15 U.S.C. §

1125(c) (2009), provides:

> the owner of a famous mark that is distinctive, inherently or
> through acquired distinctiveness, shall be entitled to an injunction
> against another person who, at any time after the owner's mark has
> become famous, commences use of a mark or trade name in
> commerce that is likely to cause dilution by blurring or dilution by
> tarnishment of the famous mark, regardless of the presence or
> absence of actual or likely confusion, of competition, or of actual
> economic injury.

Thus, to prevail on a claim under the TDRA, a plaintiff must establish that: (1) the

senior mark is famous; (2) the defendant is making use of the junior mark in commerce; (3)

defendant's use of the junior mark began after the senior mark became famous; and (4) a

likelihood of dilution. *Burberry Ltd. and Burberry USA v. Designers Imports, Inc.*, No. 07 Civ.

3997 (PAC), 2010 WL 199906, at *7 (S.D.N.Y. Jan 19, 2010).  Plaintiff satisfies each of these

elements.

**1.**     **The NYC TRIATHLON Marks are Famous**

Under both the TDRA and its predecessor, the Federal Trademark Dilution Act of

1995, 15 U.S.C. § 1125(c)(1) (2000) (Section 43(c) of the Lanham Act), a plaintiff must

demonstrate that its mark is famous. *Burberry Ltd. v. Euro Moda, Inc.*, No. 08 Civ. 5781 (CM),

2009 WL 1675080, at *10 (S.D.N.Y. June 10, 2009).  The TDRA provides its own definition of

what constitutes a famous mark: "a mark is famous if it is widely recognized by the general

consuming public of the United States as a designation of source of the goods or services of the

mark's owner." 15 U.S.C. § 1125(c)(2)(A).  Furthermore, the statute sets forth a list of four non-

exclusive factors for a court's consideration on the issue of fame:  (i) the duration, extent, and

geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (ii) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) the extent of actual recognition of the mark; and (iv) whether the mark was registered. 15 U.S.C. § 1125(c)(2)(A)(i)-(iv).

Although the registrations for Plaintiff's trademarks are still pending, Plaintiff's ten years of exclusive use, the extent of publicity associated with Plaintiff's marks, and their widespread recognition supports a finding of fame. The NYC Triathlon has been extensively promoted nationally and internationally since it began in 2001. Specifically, the NYC Triathlon has been publicized – via Plaintiff's own efforts, by sponsors, or via unsolicited coverage – by virtually every major national media outlet in the country during its ten years: ABC, NBC, CBS, FOX, CNN, The Wall Street Journal, The New York Times (in which it was the only triathlon in history to have been featured on the front page), USA Today, The New York Post, and by television and print coverage in nearly every U.S. state. V. Compl. ¶¶ 11, 14, 15, 16, 17; Korff Decl. ¶¶ 7, 16, 17, 20, 21, 22, 23. Moreover, the NYC Triathlon itself has been televised nationally and internationally by, *inter alia*, the FOX Network and the BBC, reaching over a billion people worldwide. V. Compl. ¶ 14; Korff Decl. ¶ 16. As further proof of the event's international reach, Korff estimates that 10% of the NYC Triathlon field each year is composed of international participants. Korff Decl. ¶ 11.

Plaintiff's sales success also supports a finding of fame. While an event and service of this kind cannot be judged by the traditional measure of sales figures associated with a product that sells at retail, it is clear that few, if any, Olympic distance triathlons have achieved the success of Plaintiff. The event sells out in minutes, with 20,000 people around the world this year vying for the 5,600 entry spots. V. Compl. ¶¶ 7, 21; Korff Decl. ¶ 27. The event's entry

spot revenue is 50% greater than the next biggest Olympic distance triathlon and ten times that of the average Olympic distance triathlon.  V. Compl. ¶ 30; Korff Decl. ¶ 38.  Similarly, Plaintiff receives twice as much revenue in sponsorships, a true measure of success for an event of this type, as the next biggest Olympic distance triathlon, which is also twenty times what the average Olympic distance race receives.  V. Compl. ¶ 30; Korff Decl. ¶ 38.  Plaintiff's sponsors too are well-known famous brands, including Ford Motor Company, Nautica, Marriott Hotels, Gatorade, JetBlue, Visa, Dasani, Delta Airlines, and News Corp.  V. Compl. ¶¶ 13, 16; Korff Decl. ¶¶ 15, 26.  Moreover, approximately $2 million is raised each year for national charities, such as the American Cancer Society and the Leukemia & Lymphoma Society.  V. Compl. ¶ 31; Korff Decl. ¶ 39.  Approximately 250,000 people gather to watch the race, and Plaintiff has received thousands of emails praising the event as one of the best in the world.  V. Compl. ¶¶ 21, 34; Korff Decl. ¶¶ 11, 41.  It is clear that Plaintiff's marks are widely recognized, and Plaintiff's event universally praised.

### 2.   Defendant's Use of its Mark Began after the NYC TRIATHLON Marks Became Famous

There is no dispute that Defendant is using the NYC Triathlon Club name in commerce.  It has a website, accessible worldwide, at which it offers merchandise and club membership for $300 per year.  V. Compl. ¶ 49; Korff Decl. ¶¶ 54, 55.  Thus, the question is whether Defendant began using its name after Plaintiff's marks became famous.  *See* 15 U.S.C. (c)(1).  This element too is easily satisfied.  Defendant only very recently adopted its new name, effective January 1, 2010.  This is nearly ten years after the first NYC Triathlon and well after the NYC TRIATHLON Marks acquired fame.  V. Compl. ¶¶ 1, 10, 45; Korff Decl. ¶¶ 6, 15, 18, 52.  As such, this factor weighs in favor of a finding of likely dilution.

24

### 3.  Defendant's Actions Are Likely to
###     Dilute the NYC TRIATHLON Marks

Under the TDRA, a trademark claimant need only demonstrate a likelihood of dilution by the junior mark. *See* 15 U.S.C. § 1125(c)(1); *Euro Moda*, 2009 WL 1675080, at *13. The statute further states that the likelihood of dilution may be established in two ways: by blurring or tarnishment of the mark. *See* 15 U.S.C. § 1125(c)(1); *Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 307 (S.D.N.Y. 2007). Blurring is defined as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark," 15 U.S.C. § 1125(c)(2)(B), and may be found "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1). Blurring occurs "when there is a possibility that the mark will lose its ability to serve as a unique identifier of an owner's products, due to another party's use." *Nabisco*, 50 F. Supp. 2d at 201. The statute provides six non-exclusive factors a court may consider when determining whether a mark was diluted by blurring: (i) the degree of similarity between the mark or trade name and the famous mark; (ii) the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) the degree of recognition of the famous mark; (v) whether the user of the mark or trade name intended to create an association with the famous mark; and (vi) any actual association between the mark or trade name and the famous mark. 15 U.S.C. §§ 1125(c)(2)(B)(i)-(vi).

These factors have been discussed at length in connection with Plaintiff's §43(a) claim. As established above, (i) Defendant's name differs only by the addition of the descriptive word "club" to Plaintiff's well-established marks, doing little to differentiate the two names; (ii) Plaintiff's Marks, having acquired secondary meaning, have a high degree of acquired

distinctiveness; and (iii) Plaintiff's use of the NYC TRIATHLON Marks has been exclusive for ten years. Moreover, Plaintiff has guarded its exclusivity, requiring any sponsor of the NYC Triathlon to receive Plaintiff's written approval before using the NYC TRIATHLON Marks on any third-party materials, halting unauthorized uses of the NYC TRIATHLON Marks (with Defendant's SBR as an example) and sending cease and desist letters when necessary. *See* V. Compl. ¶¶ 28, 54; Korff Decl. ¶¶ 34, 51.

Likewise factors (v) and (vi) are established above. By changing its name from SBR Triathlon Club to NYC Triathlon Club, it is clear that Defendant intended to create an association with the well-known and highly respected NYC Triathlon. Korff Decl. ¶ 51. With respect to actual association, Plaintiff documents above a concrete example of a sophisticated member of the triathlon community who associated Defendant's triathlon club with Plaintiff's operations. *See* V. Compl. ¶ 60; Korff Decl. ¶¶ 49, 50. As Defendant only recently announced the NYC Triathlon Club's formation, it is reasonable to believe that other instances of this mistaken association have occurred or will occur soon. Having established that each factor weighs in favor of finding a likelihood of dilution, Plaintiff is likely to succeed on the merits of its dilution claim by blurring.

The TDRA also provides recourse for a likelihood of dilution by tarnishment. This occurs when there is an "association arising from the similarity between a mark or a trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c); *see also Euro Moda*, 2009 WL 1675080, at *13-14 (describing dilution by tarnishment and finding that defendants had tarnished plaintiffs marks). Courts have noted that the "*sine qua non* of tarnishment is a finding that plaintiff's mark will suffer negative association through defendant's use." *Euro Moda*, 2009 WL 1675080, at *13 (citation omitted). Given Defendant's

26

reputation of trading on others' goodwill and providing poor customer service, *see* discussion *supra* Part II.A.6, there is a high likelihood that the NYC TRIATHLON Mark's will suffer a negative association through Defendant's use of them. *See also* Korff Decl. ¶¶ 57, 59.  As such, it is likely that Plaintiff's will succeed on its claim of dilution by tarnishment as well.[7]

### C.    Defendant has Violated the Anticybersquatting Consumer Protection Act

The Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d) (Section 43(d) of the Lanham Act), was enacted to prevent cybersquatting, an expression that has come to mean the bad faith and abusive registration and use of the distinctive trademarks of others as internet domain names, with the intent to profit from the goodwill associated with those trademarks. *See Sporty's Farm, L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 495 (2d Cir. 2000).  To successfully assert a claim under the ACPA, a plaintiff must demonstrate that: (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) that the defendant has a bad faith intent to profit from that mark. *See* 15 U.S.C. § 1125(d)(1); *Sporty's*, 202 F.3d at 497-99; *Broadbridge Media, L.L.C. v. hypercd.com*, 106 F. Supp. 2d 505, 510 (S.D.N.Y. 2000) (granting preliminary injunction); *see also Vogster Entm't, L.L.C. v. Mostovoy*, No. 09-CV-1036 (RRM)(RER), 2009 WL 691215, at *4 (E.D.N.Y. Mar. 16, 2009) (same).

As discussed above, the NYC TRIATHLON Marks, in use since 2001, were distinctive when Vandaele registered the www.nyctriclub.com domain name in March 2009 (*see* V. Compl. ¶¶ 47, 80) and Defendant's domain name is nearly identical and certainly confusingly

---

[7] Plaintiff is also likely to succeed on its New York State law dilution claim (Count VI), N.Y.G.B.L. § 360-l.  New York law does not require a showing of fame, but rather, only requires demonstrating acquired distinctiveness of the mark. *See Kraft*, 831 F. Supp. at 133-34. As demonstrated above, Plaintiff's NYC TRIATHLON Marks have acquired secondary meaning, particularly in New York, and Plaintiff's blurring and tarnishment analyses set forth above apply equally under New York law. *See Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 42-43 (2d Cir. 1994) (affirming district court's entry of a preliminary injunction based on likelihood that defendant violated New York's anti-dilution statute).

similar to the NYC TRIATHLON Marks. *See Vogster*, 2009 WL 691215, at *4 (defendant held

liable for cybersquatting plaintiff's "Vogster" mark by registering domain names "with the mere

addition of the words "award," "awards," or "game" (e.g., "vogsterawards.com," etc.).").

   Plaintiff has similarly discussed above the third cybersquatting factor,

Defendant's bad faith intent to profit from plaintiff's mark. *See* discussion *supra* Part II.A.5.

Nonetheless, the ACPA provides its own set of nine non-exclusive factors for a court's

consideration.[8] Those factors also favor a finding of bad faith on Defendant's part. For instance,

Defendant has no intellectual property rights in the www.nyctriclub.com domain name, as it had

not used the name in commerce prior to registration. Indeed, the NYC Triathlon Club was not

formed until almost a year after the domain name was registered. *See Sporty's*, 202 F.3d at 498

("[I]t is clear that defendants had no intellectual property rights in sportys.com at the time [one

defendant] registered the domain name. [Affiliated defendant] was not formed until nine months

after the domain name was registered. . . .") (citation omitted); V. Compl. ¶¶ 47, 56. Nor is it the

legal name of anyone affiliated with Defendant. Defendant does not make fair use or

noncommercial use of the mark at its site. To the contrary, Defendant's site makes commercial

for-profit use of the mark at its site. V. Compl. ¶ 49; Korff Decl. ¶ 55. Finally, as demonstrated

above, Defendant took Plaintiff's distinctive and famous name with intent to divert consumers

---

[8] The nine factors enumerated in the ACPA are: (1) the rights of the person, if any, in the domain name; (2) the extent to which the domain name consists of the legal name of the person; (3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain; (7) the person's provision of material and misleading false contact information when applying for the registration of the domain name; (8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names; and (9) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of section 43. 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX).

from Plaintiff's site and harm Plaintiff's goodwill for its own commercial gain by creating confusion as to source and sponsorship. V. Compl. ¶ 60; Korff Decl. ¶¶ 50, 51. There is little other explanation for Defendant's change of name.

Since Plaintiff has clearly proven likely success on all three elements required to demonstrate a violation of Section 43(d), Plaintiff respectfully requests that the Court preliminarily enjoin Defendant from using the domain name, www.nyctriclub.com.

**D.      Plaintiff Is Also Likely to Succeed on its Remaining New York State Law Claims**

"The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Nabisco*, 50 F. Supp. 2d at 212 (citations omitted). To assert an unfair competition under New York common law, a plaintiff must demonstrate: 1) a likelihood of confusion; and 2) the defendant's bad faith. *Kraft*, 831 F. Supp. at 135 (finding plaintiff showed a likelihood of success on the merits and granting a preliminary injunction); *Stern's Miracle-Gro*, 823 F. Supp. at 1093 (same). Here, "[l]ikelihood of confusion is judged in an unfair competition claim in the same manner as a Lanham Act claim." *Nabisco*, 50 F. Supp. 2d at 212 (citation omitted); *see also Tri-Star*, 14 F. Supp. 2d at 363 ("It is well recognized that the standards for Section 43(a) claims of the Lanham Act and unfair competition claims under New York Law are almost indistinguishable."). As Plaintiff has already demonstrated a likelihood of confusion between the parties' marks (*see* discussion *supra* Part

II.A) and has also established that Defendant acted in bad faith (*see* discussion *supra* Part II.A.5), it is also likely to succeed on its unfair competition claim.[9]

## III.    A BALANCE OF THE HARDSHIPS TIPS DECIDEDLY TOWARDS PLAINTIFF

While under the applicable standard the Court need not reach the issue of relative hardship here to enjoin the Defendant (since the likelihood of success is so strong), there can be no doubt that the balance tips decidedly toward Plaintiff.  If left unremedied, the immediate and irreparable harm to Plaintiff resulting from Defendant's unlawful acts would far exceed any theoretical harm to Defendant from an improvidently granted injunction.  Plaintiff lost goodwill and the control of its reputation at the moment Defendant launched its infringing triathlon club name, and Plaintiff continues to face this loss until Defendant's acts are enjoined.  No monetary sum can sufficiently remedy Plaintiff for this type of harm to its name and brand.  In addition, Plaintiff, which has been the sole operator of the NYC Triathlon since 2001, has already spent ten years, and continues to spend significant time and resources, developing and establishing its brand.  V. Compl. ¶¶ 1, 17, 18, 19, 25, 26, 33; Korff Decl. ¶¶ 12, 23, 24, 25, 28, 32, 40, 41.

Defendant, by contrast, has only just adopted the "NYC Triathlon Club" name, inexplicably changing its name from SBR Triathlon Club, as of January 2010. V. Compl. ¶ 45; Korff Decl. ¶ 52.  There seems to be no reason why Defendant could not just as easily select another new non-infringing name for its club. Korff Decl. ¶¶ 57, 58.  To be clear, NYC Triathlon is not asking that the Court prohibit Defendant from operating a triathlon club.  Rather,

---

[9] Similarly, Plaintiff is likely to succeed on its claim for violation of N.Y.G.B.L. § 349, New York's deceptive business acts law.  This statute proscribes "[d]eceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. N.Y.G.B.L. § 349 (2009).  A party challenging an act or practice under this statute must show that: (1) defendant engaged in a consumer-oriented act, (2) that the consumer-oriented act was misleading in a material way, and (3) that plaintiff consequently suffered injury. *GTFM*, 215 F. Supp. 2d at 301-02 (granting preliminary injunction where defendant violated § 349 when it intentionally used a designation "in a manner confusingly similar to [plaintiff's] use of [its own] trademark, and causing actual confusion.").  Defendant's misbranding of itself, suggesting an affiliation with Plaintiff when no such affiliation exists, is misleading to New York consumers.  It also undoubtedly harms Plaintiff, as set forth above.

Plaintiff simply requests that Defendant not use the NYC TRIATHLON Marks as part of its name. Where, as here, a defendant is not being precluded from selling its products or services, and has been using the disputed mark for only a short time or not at all and thus has developed little or no goodwill in the mark, it has been held that the irreparable harm to the plaintiff clearly outweighs any harm caused to the defendant by virtue of the entry of a preliminary injunction requiring a defendant to change its name and mark.

For example, in *Stern's Miracle-Gro Products, Inc. v. Shark Products, Inc.*, the court concluded that the balance of hardships decidedly favored the plaintiff after taking into account the facts that the defendant had only been using the mark in dispute ("Miracle-Gro"), for 18 months and that the defendant had another name available for its products. 823 F. Supp. at 1093-94. The court noted that, on the other hand, the plaintiff had spent approximately $100 million establishing the goodwill of the mark and had focused its efforts on successfully establishing secondary meaning. *Id.* at 1094. The defendant was enjoined from further use of the "Miracle Gro" mark. *Id.* at 1095. *See Les Ballets Trockadero De Monte Carlo, Inc. v. Trevino*, 945 F. Supp. 563, 574 (S.D.N.Y. 1996) (equities favored the plaintiff where the defendant' ballet company would not be prevented from performing under a different name).

Clearly, the hardships here weigh in favor of Plaintiff due to its exclusive, long-term and well-known use of the NYC TRIATHLON Marks. Certainly any harm to Defendant, who has not used the name "NYC Triathlon Club" for very long, who therefore has little or no goodwill established, and who has other names and marks available to it, cannot outweigh the irreparable harm and damage to Plaintiff should Defendant continue its infringing and confusing use of Plaintiff's name and Marks.

31

## CONCLUSION

For the reasons set forth above and upon the facts set forth in the Verified Complaint and Declaration of John Korff, plaintiff NYC Triathlon respectfully requests that the Court grant its motion pursuant to Rule 65 of the Federal Rules of Civil Procedure, for an order preliminarily enjoining Defendant's ongoing trademark and trade name infringement, dilution, cybersquatting, unfair competition, and deceptive trade practices.

DATED:   New York, New York
         February 22, 2010

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:

Peter A. Bicks
Lisa T. Simpson
Aaron G.R. Rubin

666 Fifth Avenue
New York, New York 10103
(212) 506-5000
pbicks@orrick.com
lsimpson@orrick.com
agrubin@orrick.com

Attorneys for Plaintiff
The New York City Triathlon, LLC

32