UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————x

THE NEW YORK CITY TRIATHLON, LLC,

                Plaintiff,

       -against-

NYC TRIATHLON CLUB, INC.,

                Defendant.

—————————————————————x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___3 9 10___
```

10 Civ. 1464(CM)

## DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

McMahon, J.:

Plaintiff The New York City Triathlon, LLC has filed a motion for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, to prevent and restrain Defendant NYC Triathlon Club ("NYC Triathlon Club") from using "NYC Triathlon Club," "NYC Tri Club," and "New York City Triathlon Club" as names, trade names or trademarks, or as a domain name on the Internet, or in any other way that is likely to cause confusion with Plaintiff or its trade name and trademarks, NEW YORK CITY TRIATHLON, NYC TRIATHLON, and NYC TRI (the "NYC TRIATHLON Marks").

### Background

The NYC Triathlon is an Olympic distance triathlon, consisting of a 1500 meter swim in the Hudson River, a 40 kilometer bike ride up the West Side Highway and a ten kilometer run into Central Park. V. Compl. ¶¶ 7, 8; Korff Decl. ¶ 8. It has been run every summer in New York City since 2001 and Plaintiff has, since that date, exclusively used its name and mark THE NEW YORK CITY TRIATHLON (and its related variations, THE NYC TRIATHLON and THE NYC TRI) in connection with the event. V. Compl. ¶¶ 1, 35, 67;

Korff Decl. ¶ 42. This year over 20,000 people vied for the 5600 entry spots, and they sold out in under seven minutes after registration opened online. V. Compl. ¶ 21; Korff Decl. ¶ 27. It is estimated that 250,000 people come out to watch the race. V. Compl. ¶ 21; Korff Decl. ¶ 11.

The race has developed a loyal and enthusiastic following. V. Compl. ¶¶ 20, 21, 34; Korff Decl. ¶¶ 27, 41. Thousands of participants have e-mailed John Korff, Plaintiff's principal owner and organizer of the race, to praise the race and to praise Plaintiff's organization and attention to detail. V. Compl. ¶ 34; Korff Decl. ¶ 41. To run a race of this scope and kind, Plaintiff must obtain approvals from over 40 different city and state agencies. V. Compl. ¶ 8; Korff Decl. ¶ 9. In addition, Plaintiff employs 200 people during the week of the race, hires countless additional independent contractors to handle everything from devising an emergency service plan, to building the entrance into and out of the Hudson River, to making plans for accommodating the many disabled athletes who participate, and also engages a team of 1000 volunteers to ensure the success of the race. V. Compl. ¶ 24; Korff Decl. ¶ 12. The NYC Triathlon is sanctioned by USA Triathlon ("USAT"), the independent organization that governs triathlon racing in the United States, and as such, adheres to certain safety guidelines and certifications. V. Compl. ¶ 9; Korff Decl. ¶ 10. The race attracts a diverse field of participants, ranging from elite racers to first time triathletes to physically disabled athletes. V. Compl. ¶ 24, 33; Korff Decl. ¶ 11.

The NYC Triathlon has been covered by numerous news and media outlets, including ABC, NBC, CBS, FOX, CNN, WOR, BBC, WFAN, The New York Times, The Wall Street Journal, USA Today, and the Associated Press. V. Compl. ¶¶ 14, 16; Korff Decl. ¶¶ 16, 20, 21, 22. It has received local coverage in nearly every U.S. State and has also received

2

international media coverage in countries such as Australia, India, and Great Britain. V. Compl. ¶¶ 14, 16; Korff Decl. ¶¶ 20, 21. The event has been viewed by over 60 million people in the United States and over a billion worldwide. V. Compl. ¶ 14; Korff Decl. ¶ 16. Numerous well-known and famous brands have joined the team as sponsors of the event over the years. Nautica is currently the principal sponsor, and corporations such as Ford Motor Company, Marriott Hotels, Gatorade, JetBlue, Visa, Dasani, Delta Airlines, Accenture, News Corp. (which owns The Wall Street Journal and Fox Broadcasting Company), Toyota, and Janus Capital Group have all sponsored or currently sponsor the race. V. Compl. ¶¶ 13, 16; Korff Decl. ¶¶ 15, 26.

Defendant, SBR Multisports, Inc. ("SBR"), a retail outlet selling triathlon equipment, owned and operated by Defendant's principal owner, Christophe Vandaele ("Vandaele"), was a sponsor of the NYC Triathlon from 2005-2008 and took a booth at the race Expo in 2009. V. Compl. ¶¶ 39, 41; Korff Decl. ¶ 45. By press release dated January 25, 2010, Defendant announced that effective January 1, 2010, it was changing its name from "SBR Triathlon Club" to "NYC Triathlon Club." V. Compl. ¶¶ 45, 56; Korff Decl. ¶ 52. Plaintiff sent Defendant a cease and desist letter dated January 8, 2010 seeking a response by January 15, 2010. V. Compl. ¶ 54; Korff Decl. ¶ 51. Defendant did not respond. Plaintiff commenced this action on February 22, 2010, seeking injunctive relief to protect its name mark and goodwill pursuant to Section 43(a) of the Lanham Act and the common and statutory laws of New York. V. Compl. ¶ 1.

## Standard for Obtaining a Preliminary Injunction

A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

3

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). Irreparable injury must be "likely in the absence of an injunction"; it is not enough for a plaintiff to face some "possibility" of irreparable harm. *Id.* at 375. This is because a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 376.

Notwithstanding the Supreme Court's decision in *Winter*, the Second Circuit has continued to allow parties to obtain a preliminary injunction either through: (1) "a likelihood of success on the merits"; or (2) "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 242 (2d Cir.2009); *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir.2009). The Second Circuit also requires a "likelihood of irreparable injury" to the movant, but does not require any consideration of the public interest as part of the preliminary injunction standard. *Zino Davidoff SA*, 571 F.3d at 242.

The Court finds that Plaintiffs are entitled to a preliminary injunction under either standard.

## I.   NYC TRATHLON is Likely to Succeed on the Merits of Its Claims

The Verified Complaint sets forth seven counts arising out of Defendant's use of "NYC Triathlon Club" as a name and domain name: (1) trademark infringement, false designation of origin and unfair competition pursuant to section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); (2) dilution pursuant to section 43(c) of the Lanham Act (15 U.S.C. § 1125(c)); (3) cybersquatting pursuant to section 43(d) of the Lanham Act (15 U.S.C. §

4

1125(d)); (4) common law trademark infringement under New York State law; (5) dilution

pursuant to New York General Business Law § 360-l; (6) violation of New York General

Business Law § 349, New York's deceptive acts and practices statute; and (7) unfair

competition pursuant to the common law of New York.

Based upon the application of settled law to the undisputed facts, Plaintiff is likely

to succeed on the merits of each of its claims.

### Lanham Act §43(a) Claim

Section 43(a) of the Lanham Act expressly prohibits the use in commerce of any

word, term, name, symbol, or device (or any false designation of origin) that is:

> likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,
> connection, or association of such person with another person, or as to the origin,
> sponsorship, or approval of his or her goods, services, or commercial activities by
> another person . . . .

15 U.S.C. §§ 1125(a)(1) and (a)(1)(A) (2009).[1]  To state a claim under Section 43(a), a

plaintiff must show it (1) has a valid trademark entitled to protection and (2) that the

defendant's mark is likely to cause confusion in the marketplace. *See Virgin Enters.*, 335

F.3d at 146; *Heisman Trophy Trust v. Smack Apparel Co.*, 595 F. Supp. 2d 320, 325

(S.D.N.Y. 2009). The Second Circuit has articulated eight factors (often referred to as "the

*Polaroid* factors") to be considered when assessing the likelihood of consumer confusion:

    (1)  the strength of the plaintiff's mark;

    (2)  the similarity of the plaintiff's and defendant's marks;

    (3)  the competitive proximity of the products or services;

---

[1] Section 43(a) protects both registered and unregistered marks. *See Two Pesos v. Taco Cabana*, 505 U.S. 763, 768 (1992) ("[I]t is common ground that § 43(a) protects qualifying unregistered trademarks."); *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 128 n.3 (2d Cir. 2009) (citing *Two Pesos*); *DC Comics v. Kryptonite Corp.*, 336 F. Supp. 2d 324, 331 (S.D.N.Y. 2004) (citing Section 43(a) and noting that it "protects both registered and unregistered marks.").

5

(4) the likelihood that the plaintiff will "bridge the gap" and offer a
product or service similar to the defendant's;

(5) actual confusion between the products or services;

(6) good faith on the defendant's part;

(7) the quality of the defendant's products or services; and

(8) the sophistication of buyers.

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), *cert. denied*, 368

U.S. 820 (1961). *See also Virgin Enters.*, 335 F.3d at 146-47; *Heisman Trophy*, 595 F. Supp.

2d at 326. The factors apply to competing and non-competing goods and services, and no

single factor is intended to be dispositive. *See Natural Organics, Inc. v. Nutraceutical Corp.*,

426 F.3d 576, 578 (2d Cir. 2005); *Fruit-Ices Corp. v. Coolbrands Int'l, Inc.*, 335 F. Supp. 2d

412, 418-19 (S.D.N.Y. 2004). Since the analysis used to determine the first prong of a claim

under §43(a) – whether a trademark is valid and entitled to protection – overlaps with the

analysis generally used to assess the first *Polaroid* factor – *i.e.*, strength of the mark – the

strength and protectability of Plaintiff's NYC TRIATHLON Marks are discussed together.

*1. Validity and Strength of Plaintiff's Marks*

Since the NYC TRIATHLON Marks fall into the descriptive category on the

*Abercrombie* continuum,[2] they must have "secondary meaning," *i.e.*, the ability to signify

Plaintiff as the exclusive source of the services at issue to an appreciable number of

consumers, in order to be protectible. In determining whether a mark has acquired secondary

meaning, the Second Circuit has set forth a number of factors that can be considered: 1)

---

[2] The Second Circuit's *Abercrombie*'s continuum to determine the validity of a mark finds at one
end, fanciful and arbitrary marks such as KODAK and XEROX and at the other, generic terms,
such as MILK for milk. Descriptive and suggestive marks fall in between those two extremes.
*See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)

advertising expenditures; 2) sales success; 3) unsolicited media coverage of the product; 4) attempts to plagiarize the mark; 5) the length and exclusivity of the mark's use; and 6) consumer studies linking the name to a source. *See Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir. 1985); *see also Philip Morris USA Inc. v. Cowboy Cigarette Inc.*, No. 03 Civ. 2292 (JSR), 2003 WL 22852243, at *2 (S.D.N.Y. Dec. 2, 2003); *Simon & Schuster Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 294 (S.D.N.Y. 1997). "[N]o single factor among the six is determinative, and every element need not be proved." *Simon & Schuster*, 970 F. Supp. at 295 (citations omitted).

The length and exclusivity of Plaintiff's use of the NYC TRIATHLON Marks compels a finding of secondary meaning here. This year the NYC Triathlon will celebrate its tenth anniversary as the only Olympic distance triathlon to be run in the rivers, streets, and parks of New York City. V. Compl. ¶ 7; Korff Decl. ¶ 27. During the NYC Triathlon's ten years of existence, Plaintiff has been the exclusive user of the NYC TRIATHLON Marks. V. Compl. ¶ 1; Korff Decl. ¶ 42. Plaintiff has also been extremely protective of the exclusivity and use of its marks, requiring all sponsors to seek its written approval before using the NYC TRIATHLON Marks on any goods, services, or literature they publish or distribute and policing unauthorized uses of its marks. V. Compl. ¶ 28; Korff Decl. ¶ 34. To further protect its exclusive rights to its marks, Plaintiff has filed trademark applications for its NYC TRIATHLON Marks within the United States Patent & Trademark Office. V. Compl. ¶ 38; Korff Decl. ¶ 43. Those applications are pending.

With respect to sales and financial success, the race regularly sells out within minutes of entry slots being made available online. V. Compl. ¶ 7. For the 2010 race, all 5,600 entry spots were gone in six minutes and 43 seconds, with over 20,000 people trying to enter the

7

race. V. Compl. ¶ 21; Korff Decl. ¶ 27. The race has approximately 250,000 spectators. V. Compl. ¶ 21; Korff Decl. ¶ 11. Plaintiff grosses millions of dollars in revenue per year from entry sales. V. Compl. ¶ 30; Korff Decl. ¶ 38. According to Plaintiff, the NYC Triathlon's revenue from entry spot sales is 50% greater than the nation's second largest Olympic distance triathlon and ten times greater than any other race of its kind. V. Compl. ¶ 30; Korff Decl. ¶ 38. Plaintiff also receives significant revenue from a group of well-known and established sponsors, such as Ford Motor Company, Nautica, Gatorade, JetBlue, Dasani, News Corp. (which owns the FOX Broadcasting Company and The Wall Street Journal), further evidencing the strength of the NYC TRIATHLON Marks. V. Compl. ¶¶ 13, 16; Korff Decl. ¶¶ 15, 26. According to Plaintiff, its sponsorship revenue from those sponsors is twenty times greater than the average Olympic distance triathlon. V. Compl. ¶ 30; Korff Decl. ¶ 38.

The strength of Plaintiff's Marks is further evidenced by the vast media coverage that the event receives. The USAT-sanctioned event has been covered on national and local television stations and networks such as CNN, NBC, CBS, ABC, FOX, SNY, the Outdoor Life Network (now known as Versus), New York City's local network affiliates, and the BBC; on radio stations such as WFAN and Z-100; in print publications such as the front page of The New York Times, The New York Post, USA Today, the Associated Press, and all major triathlon magazines; and on its own website, www.nyctri.com. V. Compl. ¶¶ 14, 15, 16; Korff Decl. ¶¶ 16, 17, 20, 21, 22. The event has received local coverage in nearly every U.S. state. V. Compl. ¶ 16; Korff Decl. ¶ 21. The NYC Triathlon is promoted by the race's sponsors, such as News Corp., the owner of the FOX Network and of The Wall Street Journal, and Reebok. V. Compl. ¶¶ 17, 29; Korff Decl. ¶ 36.

Plaintiff's apparent relentless attention to the participants and customer service also contributes significantly to the NYC TRIATHLON Marks' consumer recognition. After registration, Korff personally e-mails each registrant to welcome them to the race. Korff Decl. ¶ 28. The e-mails Korff receives, though, truly signify the Marks' goodwill and the secondary meaning they have earned. Thousands of people have e-mailed Plaintiff praising the race and Plaintiff as the source and organizer of the race, writing, for example, "I'm extremely proud to be associated with such a world class event" and "the NYC Triathlon, like the NYC Marathon, has become one of the great events that is recognized World Wide." V. Compl. ¶ 34. Plaintiff's staff also engages in a meticulous and time-consuming process of identifying the continually-changing and unlisted roster of the presidents of the approximately four hundred triathlon clubs registered with USA Triathlon ("USAT") (the official governing body of triathlon in the United States), and communicating with them so that those presidents and their clubs will know of the race and Plaintiff as the source of the race. V. Compl. ¶ 18; Korff Decl. ¶ 25.

Defendant's use of the NYC TRIATHLON Marks provides further evidence of their secondary meaning. *See Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 351 (S.D.N.Y. 1998). Having sponsored the NYC Triathlon for several years, Defendant's principal, Vandaele, and his company SBR, were necessarily familiar with the success of Plaintiff's event. V. Compl. ¶ 41; Korff Decl. ¶ 45. By discontinuing his sponsorship relationship with the NYC Triathlon and renaming his club "NYC Triathlon Club" (so as to suggest some affiliation with Plaintiff), Vandaele was clearly attempting to trade on Plaintiff's goodwill. Korff Decl. ¶¶ 51, 52, 57. Defendant's misappropriation of Plaintiff's name for his own

9

club is a testament to Plaintiff's success and further proof of the secondary meaning in Plaintiff's Marks.

Given the great success of the NYC Triathlon, the extensive media coverage, and the strong reputation Plaintiff has developed among consumers, Plaintiff's NYC TRIATHLON Marks have most certainly obtained secondary meaning and can be considered strong marks. *GTFM, Inc. v. Solid Clothing Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002).

Given their strong secondary meaning, the NYC TRIATHLON Marks are valid trademarks deserving of protection, satisfying the first element of a claim under Section 43(a) of the Lanham Act, and strong marks, providing persuasive support for a finding of likely confusion under the first *Polaroid* factor. *See Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., Ltd.*, No. 95 Civ. 4008 (AGS), 1995 WL 528001, at *7 (S.D.N.Y. Sept. 6, 1995) (granting preliminary injunction and noting, "[t]he strength of a mark is among the most important factors in the *Polaroid*" analysis) (citation omitted); *T. Anthony, Ltd. v. Malletier*, No. 93 Civ. 6900 (KC), 1993 WL 659682, at *3 (S.D.N.Y. Nov. 24, 1993) (same).

## 2. Similarity of Plaintiff's and Defendant's Marks

The similarity between Defendant's "NYC Triathlon Club" and the NYC TRIATHLON Marks is obvious. When assessing the similarity of two names or marks, courts "analyze the mark[s'] overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d, 532, 537 (2d Cir. 2005) (quotation omitted). "[M]arks are considered similar when they are similar in appearance, sound, and meaning." *Clinique Labs., Inc. v DEP Corp.*, 945 F. Supp. 547, 552 (S.D.N.Y. 1996) (citation omitted).

10

The central and important part of each of the marks at issue is identical in appearance, sound, and meaning – the words "New York City Triathlon," "NYC Triathlon," and "NYC Tri." Defendant's addition of the word "Club" does not change the emphasis on "NYC Triathlon" (and its aforementioned derivations) as the operative part of the mark. In fact, the addition of the word "Club" suggests that Plaintiff has launched its own club in conjunction with its signature event. "It is the general rule that one may not appropriate the entire mark of another and avoid a likelihood of confusion by the addition thereto of descriptive or otherwise subordinate matter." *Bellbrook Dairies, Inc. v. Hawthorn-Mellody Farms Dairy, Inc.*, 253 F.2d 431, 432 (C.C.P.A. 1958) ("Vita-Slim" confusingly similar to "Slim") (citations omitted); *see also A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir. 1972) (finding addition of "by Bradley" did not prevent confusion between plaintiff's protected "Cross" pens and defendant's "LaCross by Bradley" pens); *Rodgers v. Wright*, 544 F. Supp. 2d 302, 311 (S.D.N.Y. 2008) (defendants' spin-off musical group "First Ladies of Chic" was confusingly similar to original "Chic"); *Am. Express Co. v. Am. Express Limousine Serv.*, 772 F. Supp. 729, 733 (E.D.N.Y. 1991) (finding the defendant's addition of "Limousine Services" to the plaintiff's "American Express" mark enhanced rather than dispelled confusion). Since Defendant's addition of the word "Club" to the NYC TRIATHLON Marks does little to dispel likely confusion, and in fact enhances the likelihood that consumers will assume an affiliation or sponsorship, this factor too weighs strongly in favor of a finding of likely confusion.

### 3 & 4. Competitive Proximity/ "Bridging the Gap"

The next two *Polaroid* factors to be considered are competitive proximity of the services offered under the NYC TRIATHLON Marks and by the NYC Triathlon Club and

11

the intent of Plaintiff to "bridge the gap" between the two, to the extent they are not already offering the same services. The proximity inquiry looks both to the nature of the services and the structure of the relevant market and includes consideration of "the class of consumers to whom the goods are sold, the manner of advertising, the channels through which the goods are sold, and the extent to which the goods or services fall within the same class or are used together." *Clinique Labs.*, 945 F. Supp. at 553 (citations omitted). Thus, "the closer the secondary user's goods [or services] are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." *Virgin Enters.*, 335 F.3d at 150 (citation omitted).

Here, Plaintiff and Defendant clearly operate in the same channels of trade. The individuals they service are exactly the same – those seeking to participate and train for an endurance sporting event. The sponsors are also the same – sponsors of the race, sports drinks, bottled water, and equipment manufacturers, for example, are the very same sponsors that triathlon clubs seek for sponsorships. Indeed, Defendant has indicated on its website that it is actively engaged in seeking such sponsorships. V. Compl. ¶¶ 51, 54; Korff Decl. ¶ 56. Not only are the parties' services marketed to the same exact individuals and organizations, there is also no dispute that the services of a triathlon race and a club which helps competitors prepare for triathlon races are "used together." Both parties also primarily receive "customers" online. V. Compl. ¶¶ 15, 48, 50; Korff Decl. ¶¶ 24, 25. Further, given the popularity of the NYC Triathlon and the ubiquity of triathlon clubs, there is a distinct likelihood that triathletes and sponsors will assume that Plaintiff has commissioned a triathlon club in its name. This is especially likely for a race occurring in the New York City area, where the New York City Marathon, another distinguished racing event held in the

12

City, has been owned and operated by a running club, the New York Road Runners, for approximately forty years. Moreover, placing Plaintiff and Defendant in even closer proximity, Plaintiff has begun associating the NYC TRIATHLON Marks with a training club through its relationship with Reebok. *See* V. Compl. ¶ 29; Korff Decl. ¶ 36.[3]

"Bridging the gap" is closely related to the proximity of the products factor. This factor examines "whether the senior user of the mark is likely to enter the market in which the junior user is operating." *Tri-Star*, 14 F. Supp. 2d at 356 (citation omitted). For this factor, courts examine "the likelihood that, even if the plaintiff's products were not so close to the defendants' when the defendant began to market them, there was already a likelihood that plaintiff would in the reasonably near future begin selling those products." *Virgin Enters.*, 335 F.3d at 150. Since Plaintiff and Defendant are already operating in the same channel of trade, this factor is already satisfied. According to Plaintiff, it has expressly considered creating a formal USAT-registered triathlon club whose name would bear the NYC TRIATHLON Marks and operate similarly to how New York Road Runners operates with regard to the NYC Marathon. Korff Decl. ¶ 38. Plaintiff states that its plan in this regard has been derailed due to Defendant's misappropriation and the likely consumer confusion that would stem from multiple triathlon clubs bearing the names "NYC Triathlon" or "NYC Tri."

These factors thus also strongly favor a finding of likely confusion.

### 5. *Confusion Between Products and Services*

---

[3] Plaintiff also already operates the NYC Triathlon Club Championship ("NYC Tri Club Championship") as part of the NYC Triathlon (a fact of which Defendant is fully aware, as Defendant's affiliate, SBR, sponsored this event). This fact compounds the likelihood of confusion.

13

The *Polaroid* test's fifth factor, evidence of actual confusion, also favors Plaintiff. "It is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois Sportswear, U.S.A. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986); *see also Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 523 (S.D.N.Y 2009) (same). This is particularly true when an infringing product or service has been on the market for only a short time. *See Pfizer*, 652 F. Supp. 2d at 523 ("The absence of proof of actual confusion is not fatal to a finding of likelihood [of confusion], particularly where, as here, the junior mark has been in the marketplace for a relatively short period of time.") (quotation omitted); *Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*, 823 F. Supp. 1077, 1087 (S.D.N.Y. 1993) ("It would be unfair to penalize plaintiff for acting to protect [its] trademark rights before serious damage has occurred.") (quoting *Lois Sportswear*, 799 F.2d at 875).

Despite the fact that Defendant's press release announcing the formation of the NYC Triathlon Club issued only on January 25, 2010, actual confusion as to whether Plaintiff owns and operates the club has already arisen. On or about December 23, 2009, Korff received an e-mail from the president of the Westchester Triathlon Club, who indicated that he "got an email about the NYC tri club [sic]. It looks great." V. Compl. ¶ 60; Korff Decl. ¶¶ 49, 50. Under the belief that Plaintiff owned and operated the NYC Triathlon Club, the sender requested that Korff add a particular triathlon to the NYC Triathlon Club's team schedule. V. Compl. ¶ 60; Korff Decl. ¶ 50. It is safe to assume that others have been confused by Defendant's use of the NYC TRIATHLON Marks and Plaintiff's trade name. It is also likely that this confusion will persist as Defendant continues to promote itself using

14

the NYC Triathlon Club name. *See, e.g.*, *Home Shopping Club, Inc. v. Charles of the Ritz Group, Inc.*, 820 F. Supp. 763, 774 (S.D.N.Y. 1993) ("[T]he presence of past or present confusion supports, logically enough, a conclusion of future confusion, and has been recognized by the Second Circuit as an important factor in determining its likelihood."). As such, the "actual confusion" factor also favors a finding of likely confusion.

### 6. Good Faith

The next factor, which considers whether Defendant was operating in good faith when selecting its name or mark, considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill, and any confusion between his and the senior user's product. The defendant's awareness of plaintiff's mark may give rise to an inference of bad faith, which is bolstered if the defendant offers no credible explanation for its adoption of the mark." *Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442, 452 (S.D.N.Y. 2008) (citation omitted); *see also Pfizer*, 652 F. Supp. 2d at 523 (noting that defendants were aware of plaintiff's marks and that defendants refused to comply with plaintiff's cease-and-desist letters).

Defendant's bad faith is apparent here. After operating for a number of years as SBR and SBR Triathlon Club, and serving as a sponsor of Plaintiff's event, Defendant decided that rather than pay a sponsorship fee to be affiliated with Plaintiff, it would simply change its name to Plaintiff's name. V. Compl. ¶ 45; Korff Decl. ¶ 49. As such, there is no question that Defendant was aware of Plaintiff's marks and it is evident that Defendant's clear intention was and is to capitalize on Plaintiff's reputation and goodwill by fostering confusion between his club and Plaintiff's triathlon services. This intent is made further evident by Defendant's failure to respond to Plaintiff's cease and desist letter. V. Compl.

15

¶ 55; Korff Decl. ¶¶ 51, 52. This appears to be a pattern for Defendant, as it has in bad faith attempted to trade on the goodwill of other famous sporting events in the past. Specifically, Defendant attempted to hold a race it referred to as the "Iron Race," trying to create some affiliation with the famous Ironman® triathlon mark. After receiving a cease and desist letter from the owner of the Ironman® mark, the race was cancelled. V. Compl. ¶ 52; Korff Decl. ¶ 53. This factor clearly weighs in favor of finding likely confusion. *See Kraft*, 831 F. Supp. at 132 ("When a company appropriates an identical mark that is well known and has acquired a secondary meaning, an inference can be drawn that the company intends to capitalize on the goodwill and reputation of the mark . . . ."); *Stern's Miracle-Gro*, 823 F. Supp. at 1087 (same).

### 7. Quality of Defendant's Products or Services

This *Polaroid* factor "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Pfizer*, 652 F. Supp. 2d at 523 (quotation omitted). Here, "the quality of the secondary user's product goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion." *Virgin Enters.*, 335 F.3d at 152.

Plaintiff contends that Defendant has a pattern of sub-par business practices and poor customer support. For example, on at least one occasion, Defendant misused Plaintiff's brand by selling merchandise bearing the NYC TRIATHLON Marks without Plaintiff's approval. *See* V. Compl. ¶ 42; Korff Decl. ¶ 46. In another instance cited by plaintiff, during the 2009 NYC Triathlon, SBR (an Expo participant that year) advertised a raffle, whose proceeds went to charity, to be held in its physical store. Korff Decl. ¶ 47. SBR stated that the winner of the raffle would receive various triathlon gear, such as running

shorts and a pair of shoes. *Id.* For months the winner attempted to collect his prize with no response from SBR. *Id.* After repeated futile attempts to collect, the winner of the raffle contacted Korff to inform him of SBR's poor customer service. *Id.* In an e-mail to Korff describing his mistreatment at the hands of SBR, the winner of the raffle stated, "The bottom line is that [SBR] treated me like dirt cause I wasn't in there to buy a $6000 bike. Then they ignored me for months when I was trying to follow up." *Id; see also* Exhibit W to Korff Decl. As another example, Defendant's "Iron Race" was going to proceed with no safety precautions or staff in place. Korff Decl. ¶ 53. Defendant's apparent shoddy business practices and poor customer service would necessarily jeopardize Plaintiff's longstanding reputation.

### 8. Sophistication of Consumers

The *Polaroid* test's final factor analyzes the level of sophistication of consumers in the relevant market. However, even sophisticated consumers may be confused when two parties' marks and services are highly similar. *See The Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 143 (2d Cir. 1999.

In this case, the relevant market ranges from elite professionals to amateurs looking to compete in their first triathlon. Indeed, a majority of the registrants (56%) for the 2010 NYC Triathlon have identified themselves as first-time triathletes. Korff Decl. ¶ 11. It has been held that confusion is especially likely for "unsophisticated buyers." *See Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.*, No. 02 Civ. 0861 (LMM), 2002 WL 1543817, at *6 (S.D.N.Y. July 12, 2002). But here, even sophisticated triathletes are likely to be confused due to the similarity of the marks, as demonstrated by the e-mail Korff received from the president of the Westchester Triathlon Club. In his e-mail, the president, a

17

sophisticated veteran of the triathlon community, indicated he has run the Westchester

Triathlon Club for thirteen years and yet he was confused, assuming that Plaintiff had formed

Defendant's club. *See* V. Compl. ¶ 60; Korff Decl. ¶ 50. This last *Polaroid* factor thus also

favors likely confusion. *See GTFM*, 215 F. Supp. 2d at 297.

The *Polaroid* factors weigh in favor of a finding of likely confusion. Thus, Plaintiff

is likely to succeed on the merits of its claim under §43(a) of the Lanham Act.[4]

### Federal Dilution Claim

The Trademark Dilution Revision Act of 2006 ("TDRA"), 15 U.S.C. § 1125(c)

(2009), provides:

> the owner of a famous mark that is distinctive, inherently or through acquired
> distinctiveness, shall be entitled to an injunction against another person who, at
> any time after the owner's mark has become famous, commences use of a mark or
> trade name in commerce that is likely to cause dilution by blurring or dilution by
> tarnishment of the famous mark, regardless of the presence or absence of actual or
> likely confusion, of competition, or of actual economic injury.

Thus, to prevail on a claim under the TDRA, a plaintiff must establish that: (1) the

senior mark is famous; (2) the defendant is making use of the junior mark in commerce; (3)

defendant's use of the junior mark began after the senior mark became famous; and (4) a

likelihood of dilution. *Burberry Ltd. and Burberry USA v. Designers Imports, Inc.*, No. 07

Civ. 3997 (PAC), 2010 WL 199906, at *7 (S.D.N.Y. Jan 19, 2010). Plaintiff satisfies each

of these elements.

---

[4] Since the elements of Plaintiff's New York common law infringement claim mirror those of the
Lanham Act, Plaintiff is also likely to prevail on its common law trademark infringement claim
(Count IV). *See Burberry Ltd. and Burberry USA v. Designers Imports, Inc.*, No. 07 Civ. 3997
(PAC), 2010 WL 199906, at *8 (S.D.N.Y. Jan 19, 2010); *GTFM, Inc*, 215 F. Supp. 2d at 300.

18

*1. The NYC TRIATHLON Marks are Famous*

Under both the TDRA and its predecessor, the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c)(1) (2000) (Section 43(c) of the Lanham Act), a plaintiff must demonstrate that its mark is famous. *Burberry Ltd. v. Euro Moda, Inc.*, No. 08 Civ. 5781 (CM), 2009 WL 1675080, at *10 (S.D.N.Y. June 10, 2009). The TDRA provides its own definition of what constitutes a famous mark: "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). Furthermore, the statute sets forth a list of four non-exclusive factors for a court's consideration on the issue of fame: (i) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (ii) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) the extent of actual recognition of the mark; and (iv) whether the mark was registered. 15 U.S.C. § 1125(c)(2)(A)(i)-(iv).

Although the registrations for Plaintiff's trademarks are still pending, Plaintiff's ten years of exclusive use, the extent of publicity associated with Plaintiff's marks, and their widespread recognition supports a finding of fame. The NYC Triathlon has been extensively promoted nationally and internationally since it began in 2001. Specifically, the NYC Triathlon has been publicized – via Plaintiff's own efforts, by sponsors, or via unsolicited coverage – by virtually every major national media outlet in the country during its ten years: ABC, NBC, CBS, FOX, CNN, The Wall Street Journal, The New York Times (in which it was the only triathlon in history to have been featured on the front page), USA Today, The New York Post, and by television and print coverage in nearly every U.S. state. V. Compl.

19

¶¶ 11, 14, 15, 16, 17; Korff Decl. ¶¶ 7, 16, 17, 20, 21, 22, 23. The NYC Triathlon itself has been televised nationally and internationally by, *inter alia*, the FOX Network and the BBC, reaching over a billion people worldwide. V. Compl. ¶ 14; Korff Decl. ¶ 16. Korff estimates that 10% of the NYC Triathlon field each year is composed of international participants. Korff Decl. ¶ 11.

Plaintiff's sales success also supports a finding of fame. The event sells out in minutes, with 20,000 people around the world this year vying for the 5,600 entry spots. V. Compl. ¶¶ 7, 21; Korff Decl. ¶ 27. The event's entry spot revenue is 50% greater than the next biggest Olympic distance triathlon and ten times that of the average Olympic distance triathlon. V. Compl. ¶ 30; Korff Decl. ¶ 38. Plaintiff's sponsors too are well-known famous brands, including Ford Motor Company, Nautica, Marriott Hotels, Gatorade, JetBlue, Visa, Dasani, Delta Airlines, and News Corp. V. Compl. ¶¶ 13, 16; Korff Decl. ¶¶ 15, 26. Approximately $2 million is raised each year for national charities, such as the American Cancer Society and the Leukemia & Lymphoma Society. V. Compl. ¶ 31; Korff Decl. ¶ 39. Approximately 250,000 people gather to watch the race, and Plaintiff has received thousands of emails praising the event as one of the best in the world. V. Compl. ¶¶ 21, 34; Korff Decl. ¶¶ 11, 41. It is clear that Plaintiff's marks are widely recognized.

### 2. *Timing of Use of Mark*

There is no dispute that Defendant is using the NYC Triathlon Club name in commerce. It has a website, accessible worldwide, at which it offers merchandise and club membership for $300 per year. V. Compl. ¶ 49; Korff Decl. ¶¶ 54, 55. Thus, the question is whether Defendant began using its name after Plaintiff's marks became famous. *See* 15 U.S.C. (c)(1). Defendant adopted its new name, effective January 1, 2010. This is nearly ten

years after the first NYC Triathlon and well after the NYC TRIATHLON Marks acquired fame. V. Compl. ¶¶ 1, 10, 45; Korff Decl. ¶¶ 6, 15, 18, 52. As such, this factor weighs in favor of a finding of likely dilution.

### 3. Defendant's Actions

Under the TDRA, a trademark claimant need only demonstrate a likelihood of dilution by the junior mark. *See* 15 U.S.C. § 1125(c)(1); *Euro Moda*, 2009 WL 1675080, at *13. The statute further states that the likelihood of dilution may be established in two ways: by blurring or tarnishment of the mark. *See* 15 U.S.C. § 1125(c)(1); *Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 307 (S.D.N.Y. 2007). Blurring is defined as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark," 15 U.S.C. § 1125(c)(2)(B), and may be found "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1). Blurring occurs "when there is a possibility that the mark will lose its ability to serve as a unique identifier of an owner's products, due to another party's use." *Nabisco*, 50 F. Supp. 2d at 201. The statute provides six non-exclusive factors a court may consider when determining whether a mark was diluted by blurring: (i) the degree of similarity between the mark or trade name and the famous mark; (ii) the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) the degree of recognition of the famous mark; (v) whether the user of the mark or trade name intended to create an association with the famous mark; and (vi) any actual association between the mark or trade name and the famous mark. 15 U.S.C. §§ 1125(c)(2)(B)(i)-(vi).

21

These factors have been discussed at length in connection with Plaintiff's §43(a) claim. As established above, (i) Defendant's name differs only by the addition of the descriptive word "club" to Plaintiff's well-established marks, doing little to differentiate the two names; (ii) Plaintiff's Marks, having acquired secondary meaning, have a high degree of acquired distinctiveness; and (iii) Plaintiff's use of the NYC TRIATHLON Marks has been exclusive for ten years. Moreover, Plaintiff has guarded its exclusivity, requiring any sponsor of the NYC Triathlon to receive Plaintiff's written approval before using the NYC TRIATHLON Marks on any third-party materials, halting unauthorized uses of the NYC TRIATHLON Marks (with Defendant's SBR as an example) and sending cease and desist letters when necessary. *See* V. Compl. ¶¶ 28, 54; Korff Decl. ¶¶ 34, 51.

Likewise factors (v) and (vi) are established above. By changing its name from SBR Triathlon Club to NYC Triathlon Club, it is clear that Defendant intended to create an association with the well-known and highly respected NYC Triathlon. Korff Decl. ¶ 51. With respect to actual association, as stated above, a sophisticated member of the triathlon community associated Defendant's triathlon club with Plaintiff's operations. *See* Korff Decl. ¶¶ 49, 50. As Defendant only recently announced the NYC Triathlon Club's formation, it is reasonable to believe that other instances of this mistaken association have occurred or will occur soon. Having established that each factor weighs in favor of finding a likelihood of dilution, Plaintiff is likely to succeed on the merits of its dilution claim by blurring.

The TDRA also provides recourse for a likelihood of dilution by tarnishment. This occurs when there is an "association arising from the similarity between a mark or a trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c); *see also Euro Moda*, 2009 WL 1675080, at *13-14 (describing dilution by

tarnishment and finding that defendants had tarnished plaintiffs marks). Courts have noted

that the "*sine qua non* of tarnishment is a finding that plaintiff's mark will suffer negative

association through defendant's use." *Euro Moda*, 2009 WL 1675080, at *13 (citation

omitted). Given Defendant's reputation of trading on others' goodwill and providing poor

customer service, *see* discussion *supra* Part II.A.6, there is a high likelihood that the NYC

TRIATHLON Mark's will suffer a negative association through Defendant's use of them.

*See also* Korff Decl. ¶¶ 57, 59. As such, it is likely that Plaintiff's will succeed on its claim

of dilution by tarnishment as well.[5]

### Anticybersquatting Consumer Protection Act

The Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d)

(Section 43(d) of the Lanham Act), was enacted to prevent cybersquatting, an expression that

has come to mean the bad faith and abusive registration and use of the distinctive trademarks

of others as internet domain names, with the intent to profit from the goodwill associated

with those trademarks. *See Sporty's Farm, L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489,

495 (2d Cir. 2000). To successfully assert a claim under the ACPA, a plaintiff must

demonstrate that: (1) its marks were distinctive at the time the domain name was registered;

(2) the infringing domain names complained of are identical to or confusingly similar to

plaintiff's mark; and (3) that the defendant has a bad faith intent to profit from that mark. *See*

15 U.S.C. § 1125(d)(1); *Sporty's*, 202 F.3d at 497-99; *Broadbridge Media, L.L.C. v.*

---

[5] Plaintiff is also likely to succeed on its New York State law dilution claim (Count VI), N.Y.G.B.L. § 360-l. New York law does not require a showing of fame, but rather, only requires demonstrating acquired distinctiveness of the mark. *See Kraft*, 831 F. Supp. at 133-34. As demonstrated above, Plaintiff's NYC TRIATHLON Marks have acquired secondary meaning, particularly in New York, and Plaintiff's blurring and tarnishment analyses set forth above apply equally under New York law. *See Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 42-43 (2d Cir. 1994) (affirming district court's entry of a preliminary injunction based on likelihood that defendant violated New York's anti-dilution statute).

*hypercd.com,* 106 F. Supp. 2d 505, 510 (S.D.N.Y. 2000) (granting preliminary injunction); *see also Vogster Entm't, L.L.C. v. Mostovoy,* No. 09-CV-1036 (RRM)(RER), 2009 WL 691215, at *4 (E.D.N.Y. Mar. 16, 2009) (same).

As discussed above, the NYC TRIATHLON Marks, in use since 2001, were distinctive when Vandaele registered the www.nyctriclub.com domain name in March 2009 (*see* V. Compl. ¶¶ 47, 80) and Defendant's domain name is nearly identical and certainly confusingly similar to the NYC TRIATHLON Marks. *See Vogster,* 2009 WL 691215, at *4 (defendant held liable for cybersquatting plaintiff's "Vogster" mark by registering domain names "with the mere addition of the words "award," "awards," or "game" (e.g., "vogsterawards.com," etc.).").

The Court has also discussed above the third cybersquatting factor, Defendant's bad faith intent to profit from plaintiff's mark. *See* discussion *supra* Part II.A.5. Nonetheless, the ACPA provides its own set of nine non-exclusive factors for a court's consideration.[6] Those factors also favor a finding of bad faith on Defendant's part. For instance, Defendant has no intellectual property rights in the www.nyctriclub.com domain name, as it had not used the name in commerce prior to registration. Indeed, the NYC Triathlon Club was not formed

---

[6] The nine factors enumerated in the ACPA are: (1) the rights of the person, if any, in the domain name; (2) the extent to which the domain name consists of the legal name of the person; (3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain; (7) the person's provision of material and misleading false contact information when applying for the registration of the domain name; (8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names; and (9) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of section 43. 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX).

24

until almost a year after the domain name was registered. *See Sporty's*, 202 F.3d at 498; V. Compl. ¶¶ 47, 56. Nor is it the legal name of anyone affiliated with Defendant. Defendant does not make fair use or noncommercial use of the mark at its site. To the contrary, Defendant's site makes commercial for-profit use of the mark at its site. V. Compl. ¶ 49; Korff Decl. ¶ 55. Finally, Defendant took Plaintiff's distinctive and famous name with intent to divert consumers from Plaintiff's site and harm Plaintiff's goodwill for its own commercial gain by creating confusion as to source and sponsorship. V. Compl. ¶ 60; Korff Decl. ¶¶ 50, 51. There is little other explanation for Defendant's change of name.

Accordingly, plaintiff has shown a likelihood of success on his'cybersquatting claim.

### New York State Law Claims

"The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Nabisco*, 50 F. Supp. 2d at 212 (citations omitted). To assert an unfair competition under New York common law, a plaintiff must demonstrate: 1) a likelihood of confusion; and 2) the defendant's bad faith. *Kraft*, 831 F. Supp. at 135; *Stern's Miracle-Gro*, 823 F. Supp. at 1093 (same). Here, "likelihood of confusion is judged in an unfair competition claim in the same manner as a Lanham Act claim." *Nabisco*, 50 F. Supp. 2d at 212 (citation omitted); *see also Tri-Star*, 14 F. Supp. 2d at 363. Since the Court has found that Plaintiff has already demonstrated a likelihood of confusion between the parties' marks (*see* discussion *supra* Part II.A) and has also

established that Defendant acted in bad faith, Plaintiff is also likely to succeed on its unfair competition claim.[7]

## II.    Irreparable Harm

Plaintiff has invested substantial and unprecedented efforts into making the NYC Triathlon not only a financially successful venture, but one that is well-known, enjoyed by the participants and respected as a premiere international racing event. V. Compl. ¶¶ 18, 19, 30; Korff Decl. ¶¶ 25, 38.  Plaintiff has amassed substantial goodwill and a very favorable reputation during its ten years of operation.  V. Compl. ¶¶ 20, 34; Korff Decl. ¶ 28.

By misappropriating Plaintiff's trade name and the NYC TRIATHLON Marks, Defendant is not only trading on Plaintiff's earned goodwill, but also is taking from Plaintiff the ability to control its reputation and the services offered under its name and mark.  This harm cannot be quantified and is irreparable.  Every day that Defendant operates with Plaintiff's name, the ability of Plaintiff to signify its services and its reputation by its NYC TRIATHLON Marks is lessened.

---

[7] Similarly, Plaintiff is likely to succeed on its claim for violation of N.Y.G.B.L. § 349, New York's deceptive business acts law.  This statute proscribes "[d]eceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. N.Y.G.B.L. § 349 (2009).  A party challenging an act or practice under this statute must show that: (1) defendant engaged in a consumer-oriented act, (2) that the consumer-oriented act was misleading in a material way, and (3) that plaintiff consequently suffered injury.  GTFM, 215 F. Supp. 2d at 301-02 (granting preliminary injunction where defendant violated § 349 when it intentionally used a designation "in a manner confusingly similar to [plaintiff's] use of [its own] trademark, and causing actual confusion.").  Defendant's misbranding of itself, suggesting an affiliation with Plaintiff when no such affiliation exists, is misleading to New York consumers.  It also harms Plaintiff.

26

It is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard. *See Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,* 794 F.2d 38, 43 (2d Cir. 1986); *Saban Entm't, Inc. v. 222 World Corp.,* 865 F. Supp. 1047, 1056 (S.D.N.Y. 1994); *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.,* 831 F. Supp. 123, 136 (S.D.N.Y. 1993). It has also been held repeatedly in the Second Circuit that where there is likely confusion in an action for trademark infringement, the requisite irreparable harm is established as a matter of course. *See Zino Davidoff SA,* 571 F.3d at 246-47; *Weight Watchers Int'l, Inc. v. Luigino's, Inc.,* 423 F.3d 137, 144 (2d Cir. 2005); *Gucci Am., Inc. v. Curveal Fashion,* No. 09 Civ. 8458(RJS), 2010 WL 308303, at *2 (S.D.N.Y. Jan. 20, 2010); *E. Gluck Corp. v. Rothenhaus,* 585 F. Supp. 2d 505, 519 (S.D.N.Y. 2008).

A presumption of irreparable harm also flows from a finding of likely dilution. *See Ryan v. Volpone Stamp Co.,* 107 F. Supp. 2d 369, 404 (S.D.N.Y. 2000); *NBA Props. v. Untertainment Records LLC,* No. 99 Civ. 2933 (HB), 1999 WL 335147, at *6 (S.D.N.Y. May 26, 1999); *Nabisco, Inc. v. PF Brands, Inc.,* 50 F. Supp. 2d 188, 197 (S.D.N.Y. 1999).

Due to the likelihood of Plaintiff's success on both its 43(a) and its dilution claims, Plaintiff is entitled to a presumption of irreparable harm

## III.   **Balance of the Hardships**

The issue of relative hardship here tips decidedly toward Plaintiff. If left unremedied, the immediate and irreparable harm to Plaintiff resulting from Defendant's unlawful acts would far exceed any theoretical harm to Defendant from an improvidently granted injunction. Plaintiff lost goodwill and the control of its reputation at the moment Defendant launched its infringing triathlon club name, and Plaintiff continues to face this loss until

27

Defendant's acts are enjoined.  No monetary sum can sufficiently remedy Plaintiff for this type of harm to its name and brand.  In addition, Plaintiff, which has been the sole operator of the NYC Triathlon since 2001, has already spent ten years, and continues to spend significant time and resources, developing and establishing its brand.  V. Compl. ¶¶ 1, 17, 18, 19, 25, 26, 33; Korff Decl. ¶¶ 12, 23, 24, 25, 28, 32, 40, 41.

Defendant, by contrast, has only just adopted the "NYC Triathlon Club" name, inexplicably changing its name from SBR Triathlon Club, as of January 2010.  V. Compl. ¶ 45; Korff Decl. ¶ 52.  There seems to be no reason why Defendant could not just as easily select another new non-infringing name for its club.  Korff Decl. ¶¶ 57, 58.    Enjoining Defendant from using Plaintiff's Mark will not precluded Defendant from selling its products or services.  Defendant has been using the disputed mark for only a short time and thus has developed little or no goodwill in the mark.  The irreparable harm to the Plaintiff clearly outweighs any harm caused to the Defendant by virtue of the entry of a preliminary injunction requiring a defendant to change its name and mark.

In *Stern's Miracle-Gro Products, Inc. v. Shark Products, Inc.*, the court concluded that the balance of hardships decidedly favored the plaintiff after taking into account the facts that the defendant had only been using the mark in dispute ("Miracle-Gro"), for 18 months and that the defendant had another name available for its products.  823 F. Supp. at 1093-94.  The court noted that, on the other hand, the plaintiff had spent approximately $100 million establishing the goodwill of the mark and had focused its efforts on successfully establishing secondary meaning.  *Id.* at 1094.  The defendant was enjoined from further use of the "Miracle Gro" mark. *Id.* at 1095.  *See Les Ballets Trockadero De Monte Carlo, Inc. v. Trevino*, 945 F. Supp. 563, 574 (S.D.N.Y. 1996).

28

The hardships here weigh in favor of Plaintiff due to its exclusive, long-term and well-known use of the NYC TRIATHLON Marks. Any harm to Defendant, who has not used the name "NYC Triathlon Club" for very long, who therefore has little or no goodwill established, and who has other names and marks available to it, would not outweigh the irreparable harm and damage to Plaintiff should Defendant continue its infringing and confusing use of Plaintiff's name and Marks.

Accordingly, Plaintiff's motion for an order preliminarily enjoining Defendant's ongoing trademark and trade name infringement, dilution, cybersquatting, unfair competition, and deceptive trade practices is granted.

This constitutes the decision and order of the Court.

March 9, 2010

U.S.D.J.

29

BY HAND AND ECF TO:

Peter A. Bicks
Lisa T. Simpson
Aaron G.R. Rubin
666 Fifth Avenue
New York, New York 10103
Attorneys for Plaintiff
The New York City Triathlon, LLC

Christopher Vandaele
NYC Triathlon Club
309 West 57th Street, #908
New York, NY 10019
Principal for Defendant
NYC Triathlon Club

30