**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

THE NEW YORK CITY TRIATHLON, LLC,

        Plaintiff,

        v.

NYC TRIATHLON CLUB, INC.,

        Defendant.

-------------------------------------------------------------x

Case No. 10 Civ. 1464 (CM)

## CORRECTED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO VACATE THE PRELIMINARY INJUNCTION AND IN OPPOSITION TO PLAINTIFF'S MOTION TO ENFORCE THE PRELIMINARY INJUNCTION

# Table of Contents

**Table of Authorities**

**PRELIMINARY STATEMENT** ................................................................................................1

**STATEMENT OF FACTS** ....................................................................................................1

   **I.**  **Background to the Formation of NYC Triathlon Club**................................1

   **II.**  **Customary Geographic Naming Practice For Triathlon Clubs and Races**..................3

   **III.** **SBR's Past Relationship with Plaintiff** ................................................3

   **IV.** **SBR's Reputation in the Industry** ............................................................4

   **V.**  **The Current Dispute** ....................................................................................6

**ARGUMENT** ........................................................................................................................7

   **I.**  **The Preliminary Injunction Should Be Vacated**............................................7

   **II.**  **Plaintiff Failed to Meet Its Burden**............................................................8

      **A.**  **Plaintiff Is Not Likely To Succeed on the Merits** ................................8

         1.  Plaintiff's Purported Marks Are Not Entitled
to Trademark Protection ....................................................................9

            a.  Plaintiff's Marks Are Generic................................................9

         2.  Even If Plaintiff's Marks Are Descriptive, Plaintiff's Marks
Have Not Acquired Secondary Meaning .........................................12

         3.  Even If Plaintiff Has Protectable Trademark Rights,
There Is No Likelihood of Confusion................................................14

            a.  Strength and Similarity of the Marks....................................14

            b.  Similarity of Services ...........................................................15

             c.  Bridging the Gap ..................................................................16

             d.  Actual Confusion ..................................................................17

             e.  Defendant's Good Faith .......................................................18

             f.  Quality of Defendant's Services ...........................................20

             g.  Sophistication of the Consumers ..........................................21

         4.  Plaintiff Is Not Likely To Succeed on Either Its
Federal or State Dilution Claims .....................................................21

            a.  Plaintiff's Federal Dilution Claim Must Fail Because
Its Marks Are Not Famous...................................................22

            b  Plaintiff's State Dilution Claim Must Fail Because
Its Marks Are Not Sufficiently Distinctive.......................................23

            c.  Even If Its Marks Were Sufficiently Famous or Distinctive,
Plaintiff Cannot Prove Blurring or Tarnishment ...........................24

5. The Club Did Not Violate the ACPA ....................................................................25

**B. Plaintiff Cannot Show a Likelihood of Irreparable Harm the Winter Standard. ....................................................................................26**

1. Recent Supreme Court Law Has Clarified The Legal Standard For Irreparable Harm ..............................................................26

    a. Plaintiff Is Not Likely To Suffer the Irreparable Harm Required for Preliminary Injunction Relief. ...................................28

        (1) The NYC Triathlon Club's Goods and Services Do Not Overlap or Compete with Plaintiff's ............................28

        (2) The Names At Issue Are Not Identical ....................................29

        (3) Plaintiff's Reputation Is Not Likely To Be Harmed, and Any Potential Harm Can Be Alleviated by Less Restrictive Means................29

**C. The Balance of Hardships Tips in the Club's Favor ...................................31**

**D. Plaintiff Should Post At Least $50,000.00 In Bond....................................32**

**E. Opposition to Plaintiff's Motion to Enforce the Preliminary Injunction ...................33**

**CONCLUSION** ..............................................................................................34

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*AB Electrolux v. Bermil Indus. Corp.*,
    481 F. Supp. 2d 325 (S.D.N.Y. 2007)....................................................................32

*Abercombie & Fitch Co. v. Hunting World, Inc.*,
    537 F.2d 4 (2d. Cir. 1976)................................................................................9

*Am. Cyanamid Corp. v. Connaught Labs., Inc.*,
    800 F.2d 306 (2d Cir. 1986).............................................................................9

*Ariz. Int'l Ltd. v. Merrill Lynch Realty Operating P'ship*
    *22 U.S.P.Q.2d 1156 (D. Ariz. 1991)...............................................................10*

*Artisan Mfg., Corp. v. All Granite & Marble Corp.*
    *559 F. Supp. 2d 442 (S.D.N.Y. 2008)..............................................................18*

*Bell & Howell: Mamiya Co. v. Masel Supply Co.*,
    719 F.2d 42 (2d Cir. 1983).........................................................................27, 30

*Burberry Ltd. v. Euro Moda, Inc.*,
    08 Civ. 5781, 2009 U.S. Dist. LEXIS 53250 (S.D.N.Y. June 10, 2009)................22

*CES Publ'g Corp. v. St. Regis Publ'ns Inc.*,
    531 F.2d 11 (2d Cir. 1975).............................................................................9

*Christopher D. Smithers Found., Inc. v. St. Luke's-Roosevelt Hosp. Ctr.*,
    No. 00 Civ. 5502, 2003 U.S. Dist. LEXIS 373 (S.D.N.Y. Jan. 13, 2003)............22

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*,
    794 F.2d 38 (2d Cir. 1986).............................................................................30

*Cicena Ltd. v. Columbia Telecomm. Group*,
    900 F.2d 1546 (Fed. Cir. 1990).......................................................................12

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985)....................................................................27, 28, 30

*Citigroup Global Mkts. v. VCG Special Opportunities Master Fund Ltd.*,
    2010 U.S. App. LEXIS 5025 (2d Cir. Mar. 10, 2010)........................................28

*Courtenay Commc'ns Corp. v. Hall*,
    334 F.3d 210 (2d Cir. 2003)............................................................................10

*Dan-Foam A/S v. Brand Named Beds, LLC*,
    500 F. Supp. 2d 296 (S.D.N.Y. 2007)..............................................................23

*Deere & Co. v. MTD Prods., Inc.*,
  41 F.3d 39 (2d Cir. 1994)................................................................25

*Doctor's Assocs., Inc. v. Distajo*,
  107 F.3d 126 (2d Cir. 1997)............................................................33

*Dudley v. HealthSource Chiropractic, Inc.*,
  585 F. Supp. 2d 433 (W.D.N.Y. 2008) ....................................25–26

*E. R. Squibb & Sons, Inc., v. Cooper Labs, Inc.*,
  536 F. Supp. 523 (S.D.N.Y. 1982) ...............................................10

*Genesee Brewing Co. v. Stroh Brewing Co.*,
  124 F.3d 137 (2d Cir. 1997)...........................................................27

*Ideal Toy Corp. v. Sayco Doll Corp.*,
  302 F.2d 623 (2d Cir. 1962).............................................................7

*In re A La Vielle Russie, Inc.*,
  60 U.S.P.Q.2d 1895 (T.T.A.B. 2001) ...........................................10

*Gruner + Jahr USA Publ'g v. Meredith Corp.*,
  991 F.2d 1072 (2d Cir. 1993)..........................................................12

*Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*,
  478 F. Supp. 2d 340 (E.D.N.Y. 2007) ...........................................12

*Lang v. Ret. Living Publ'g Co.*,
  949 F.2d 576 (2d Cir. 1991)............................................................16

*Marconi Wireless Tel. Co. of Am. v. United States*,
  320 U.S. 1 (1943)..............................................................................7

*Mastrovincenzo v. City of New York*,
  435 F.3d 78 (2d Cir. 2006)..............................................................27

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)...........................................................................8

*Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*,
  875 F.2d 1026 (2d Cir. 1989)..........................................................24

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
  818 F.2d 254 (2d Cir. 1987)............................................................18

*Monarch Licensing, Ltd. v. Ritam Int'l, Ltd.*,
  24 U.S.P.Q.2d (BNA) 1456 (S.D.N.Y. 1992). ........................15, 33

*Mr. Water Heater Enters., Inc. v. 1-800-Hot Water Heater, LLC*,
    648 F. Supp. 2d 576 (S.D.N.Y. 2009).....................................................17

*N.Y. Stock Exch., Inc. v. New York, New York Hotel, LLC*,
    293 F.3d 550 (2d Cir. 2002)...........................................................24

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.*,
    269 F.3d 114 (2d Cir. 2001)...........................................................17

*Park'n Fly, Inc. v. Dollar Park & Fly, Inc.*,
    469 U.S. 189 (1985)........................................................................9

*Reese Publ'g Co., Inc. v. Hampton Int'l Commc'ns, Inc.*,
    F.2d 7 (2d Cir. 1980).....................................................................10

*Sally Gee, Inc. v. Myra Hogan, Inc.*,
    699 F.2d 621 (2d Cir. 1983).........................................................23

*Savin Corp. v. Savin Group*,
    391 F.3d 439 (2d Cir. 2004).........................................................17

*SMJ Group, Inc. v. 417 Lafayette Rest. LLC*,
    439 F. Supp. 2d 281 (S.D.N.Y. 2006)......................................28–29

*Soltex Polymer Corp. v. Fortex Indus., Inc.*,
    832 F.2d 1325 (2d Cir. 1987).......................................................31

*Somoza v. N.Y. City Dept. of Educ.*,
    No. 06 Civ. 5025, 2006 WL 1981758 (S.D.N.Y. July 10, 2006) ...........31

*Sports Auth., Inc. v. Prime Hospitality Corp.*,
    89 F.3d 955 (2d Cir. 1996)...........................................................16

*Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*,
    202 F.3d 489 (2d Cr. 2000)..........................................................25

*Springs Mills, Inc. v. Ultracashmere House, Ltd.*,
    724 F.2d 352 (2d Cir. 1983).........................................................31

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
    588 F.3d 97 (2d Cir. 2009)...........................................................24

*Strange Music, Inc. v. Strange Music, Inc.*,
    326 F. Supp. 2d 481 (S.D.N.Y. 2004)..........................................16

*Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*,
    282 F.3d 23 (1st Cir. 2002)...........................................................34

*Taubman Co. v. Webfeats*,
   319 F.3d 770 (6th Cir. 2003) ...................................................................34

*TCPIP Holding Co., Inc., v. Haar Commc'ns, Inc.*,
   244 F.3d 88 (2d Cir. 2001).....................................................................15, 22–23

*Thompson Med. Co., Inc. v. Pfizer Inc.*,
   753 F.2d 208 (2d Cir. 1985)....................................................................12

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
   60 F.3d 27 (2d Cir. 1995)........................................................................27

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
   No. 06 Civ. 14245, 2007 WL 1296205 (S.D.N.Y. May 2, 2007)...........33

*U-Neek v. Wal-Mart Stores, Inc.*,
   147 F. Supp. 2d 158 (S.D.N.Y. 2001).....................................................23–24

*Update Art, Inc. v. Charnin*,
   110 F.R.D. 26 (S.D.N.Y. 1986) ...............................................................7

*Vitarroz Corp. v. Borden, Inc.*,
   644 F.2d 960 (2d Cir. 1981).....................................................................28–29

*W.W.W. Pharm. Co. v. Gillette Co.*,
   984 F.2d 567 (2d Cir. 1993).....................................................................16, 18, 21

*Welch Allyn, Inc. v. Tyco Int'l Servs. AG*,
   200 F. Supp. 2d 130 (N.D.N.Y. 2002)....................................................23

*Winter v. Natural Res. Def. Council, Inc.*,
   129 S. Ct. 365, 374 (2008).......................................................................8, 27

**FEDERAL STATUTES**

15 U.S.C. § 1125(c)(2)(A)(iv) ........................................................................22

**STATE STATUTES**

N.Y. General Business Law § 360-l ................................................................23–24

**RULES**

Fed. R. Civ. P. 60(b) ...................................................................................................7

Fed. R. Civ. P. 65(c) .................................................................................................32

## PRELIMINARY STATEMENT

The NYC Triathlon Club (the "Club") was preliminarily enjoined from using its geographically descriptive name for a club comprised of local triathletes.  The Club, a recently formed entity without funds to defend a lawsuit, appeared at the preliminary injunction hearing without counsel.  Consequently, the preliminary injunction was entered based solely on Plaintiff's one-sided presentation of the alleged facts.  The Club has since retained counsel and hereby presents evidence showing it should not be enjoined from using the best words possible to describe the nature of its club, merely because Plaintiff also uses an apt combination of a geographic and generic term to describe its race.

## STATEMENT OF FACTS

### I.     Background to the Formation of NYC Triathlon Club

The Club is intended to serve the needs of New York City's triathlete community by helping its members train for the sport.  Declaration of Chistophe Vandaele (hereinafter "CV Decl.") at 4.  The Club schedules swim, bike and run training sessions, and holds seminars on training and nutrition. *Id.*  The Club does not organize, promote or stage triathlons, or operate for profit. *Id*.

The Club is the informal successor to the SBR Triathlon Club (the "SBR Tri Club").  SBR Tri Club was operated as part of SBR Multisports, Inc. ("SBR").  Since January 2005, SBR has been a leading retailer of triathlon equipment in New York City. *Id*. ¶ 5.

In May 2005, SBR began to sponsor a team of triathletes who competed in triathlons throughout the country. *Id*. ¶ 6.  In January 2007, SBR also established the SBR Tri Club as a community triathlon club. *Id.*  Members paid an annual fee to subsidize the purchase of

uniforms, hire coaches, hold seminars and organize training sessions. The SBR Tri Club membership fees, however, did not entirely cover the Club's costs. *Id*. ¶ 7.

In or about August 2009, Mr. Vandaele decided that it was in SBR's interest to separate itself from the Club. *Id*. Rather than disband the club and leave its approximately 200 members in the lurch, Mr. Vandaele decided to spin off the club as a separate entity. *Id.*

In mid-August 2009, Mr. Vandaele contacted several SBR Tri Club members concerning his plan to create a totally independent triathlon club. *Id*. 7, Ex. 1. Mr. Vandaele decided to name the new club the "NYC Triathlon Club" because it was the best and most direct way to describe a triathlon club for people who live and/or work in New York City. *Id*. ¶ 12. Indeed, it is customary in the triathlon community for triathlon clubs to be named after their location, as demonstrated by the LA Tri Club, the Las Vegas Triathlon Club, the Philadelphia Triathlon Club, and the San Francisco Triathlon Club, to name a few. *Id*. Ex. 4. As geographically named clubs have long existed even in cities that also have triathlons incorporating the same geographic locality, *id*., the adoption of such a name was a logical choice. As part of the formation of the new club, Mr. Vandaele consulted with the founder of the LA Tri Club for advice on how to run an independent club. *Id*. ¶ 13; Ex. 5 (Declaration of Paul Hekimian ("PH Decl.")) ¶ 13.

On November 19, 2009, NYC Triathlon Club, Inc. was incorporated. CV Decl. ¶ 8. On December 17, 2009, the SBR Tri Club members were sent an e-mail to advise them of the launch of the Club. *Id.* ¶ 9, Ex. 2. On December 23, 2009, another e-mail was disseminated advising of the formation of the Club beginning January 1, 2010, and the launch of the website. *Id*. ¶ 10, Ex. 3.

SBR and the Club are wholly independent from each other. Their only connection is the fact that Mr. Vandaele volunteered to be the president for the first year in order to get the Club

off the ground and agreed to allow SBR to be used as the "clubhouse," since the Club cannot afford to rent space. *Id.* ¶ 11.

## II.     <u>Customary Geographic Naming Practice For Triathlon Clubs and Races</u>

It is common for triathlon clubs to choose a name that combines the geographic place in which it operates and/or from which it draws its membership with the words "Triathlon Club" and/or "Tri Club."   Moreover, as shown in Exhibit 4 to the Vandaele Declaration and declarations from the presidents of the LA Tri Club, Philadelphia Triathlon Club and Las Vegas Triathlon Club, geographically named clubs often coexist with triathlon events bearing the same geographic descriptor as part of their name. *See* PH Decl. ¶¶ 11–12; CV Decl. Ex. 6 (Declaration of Adam Alper (the "AA Decl.")) ¶¶ 7–8, 7 (Declaration of David Carlson (the "DC Decl.")) ¶ 6.

Indeed, Plaintiff's race already coexists with the organization "NEW YORK TRIATHLON." CV Decl. ¶ 15; Ex. 9.   That organization has existed for over 20 years, well before Plaintiff's race. *Id*.   This prior organization is not a training club, but organizes and stages triathlon and duathlons (run/bike/run) in New York City and elsewhere in New York.   *See* nytc.org and nytri.org.   This organization and Plaintiff's New York City Triathlon provide directly competing triathlon race organizing/promotion services. *Id.* ¶ 15.   Yet these two organizations have peacefully co-existed for the last ten years, notwithstanding their almost identical names. *Id.*

## III.     <u>SBR's Past Relationship with Plaintiff</u>

The Club and SBR are wholly independent of each other.   Accordingly, NYC Triathlon Club has no prior relationship with Plaintiff.   The Club has not sponsored Plaintiff's race or otherwise been involved with Plaintiff.

The only connection between the Club and Plaintiff is Mr. Vandaele, the Club's president. During the early years of Plaintiff's event, at Mr. Korff's request, Mr. Vandaele personally assisted Plaintiff in developing Plaintiff's race expo. CV Decl. ¶ 18. Mr. Korff had absolutely no experience in the sport of triathlon when he first began organizing and promoting Plaintiff's event, and during the first years of the race the race expo was a low level affair. *Id*. Mr. Korff sought Mr. Vandaele's assistance, and Mr. Vandaele convinced his friends and vendors in the industry to participate at the expo. *Id*. As a result, the expo now attracts many exhibitors and is well attended by triathletes, thereby generating significant sales of merchandise. Korff Decl. ¶ 32.

Additionally, from 2005 through 2008, SBR sponsored Plaintiff's race and, through 2009, operated a booth at the expo. CV Decl. ¶ 16. SBR chose not to sponsor the race in 2009 due to the high cost of sponsorship and the economic downtown. *Id*. Still, SBR continued as an exhibitor at the race expo and intended to do so for 2010, until Plaintiff indicated during this lawsuit that SBR would not be welcomed. Korff Decl. ¶ 48.

## IV.    SBR's Reputation in the Industry

SBR is one of the leading triathlon retailers in the country. Significant positive publicity and customer feedback attest to SBR's stellar reputation. By way of example, *Inside Triathlon* magazine voted SBR one of the top 15 trishops in the country, and the *Village Voice* rated it the "best bike shop" in New York City. CV Decl. ¶ 19. Customer comments from *Zagat's New York City Shopping* survey described SBR's service as "go above and beyond." *Id*. Ex. 10. This commitment to customer service knows no price point, as SBR is dedicated to providing triathletes with the widest possible selection of the latest top of the line equipment in all price ranges to suit the needs of triathletes of all levels. *Id*. ¶ 20.

Considering the large number of customers SBR has serviced for five years, it is telling that Plaintiff had to to exaggerate a single incident – a delay in providing a raffle prize – to attempt to smear SBR.  The unfortunate delay resulted from an unanticipated series of events, triggered when the out of town prize winner initially contacted SBR by e-mailing a woman who had recently left SBR's employ. *Id*. ¶ 21.  When he finally visited SBR this past summer, SBR did not have the prize in stock in his size, but promptly ordered it. *Id*.  The raffle winner was satisfied and did not believe that the incident was significant. *Id*.  Plaintiff's attempt to spin this incident as supposed evidence of SBR's "poor reputation" is disingenuous.

Similarly, Plaintiff engages in egregious distortions in an attempt to paint SBR as a serial trademark infringer.  Plaintiff claims that SBR misused the name NYC Triathlon by ***selling*** "unauthorized apparel." Korff Decl. ¶ 46.  Rather, noticing that Plaintiff had neglected to provide "finisher" t-shirts (which are commonly provided by triathlon organizers) at its 2004 race, SBR gave away ***free*** "finisher" t-shirts at its expo booth as a promotional item. CV Decl. ¶ 22.  SBR saw no harm in providing such promotional items when Plaintiff was not doing so itself, and immediately stopped the promotion roughly two hours into the expo when Plaintiff complained. *Id*.  During those two hours, SBR handed out only a handful of the shirts. *Id*.  As evidence of the trivial nature of this incident, Plaintiff continued to allow SBR to sponsor Plaintiff's race and participate in the race expo in the years since.

In the same manner, Plaintiff misleadingly resurrects a four year old incident involving the IRONMAN trademark.  In 2006, Mr. Vandaele and about a dozen of his regular training partners scheduled a training day where they would do a group "Iron-distance" swim, bike and run. CV Decl. ¶ 23.  It was not a "race" and it was not open to the public. *Id*.  Through word of mouth, however, people in the triathlon community heard about the training plans and wanted to

participate. *Id.* Ultimately, a reporter for the *New York Times* learned of it and mistakenly referred to the training day as an underground IRONMAN race, asking the owners of the IRONMAN trademark for comment. *Id.* That led to a cease and desist letter, and consequently the training session was cancelled. *Id.*

## V.     The Current Dispute

On January 8, 2010, Plaintiff sent a letter to the NYC Triathlon Club demanding that it discontinue its use of the name. CV Decl. ¶ 25. Mr. Vandaele, in consultation with the Club's Board, did not respond to the letter believing that the demand was unfounded. *Id.* Indeed, based on the Board's collective years of experience as triathletes, the Club did not believe there would be confusion at any level. *Id.* Although the better practice would have been to respond to the letter, the result would have been the same, as the Club had no intention of discontinuing its use of the NYC Triathlon Club name absent a Court Order.

The publicity from this lawsuit and the entry of the preliminary injunction has caused and continues to cause this fledgling organization to suffer irreparable injury. *Id.* ¶ 26. This is the start of the triathlon season. Races start in May and run through November. Now is the time people are looking to get in shape for triathlon season and to start seriously training. *Id.* As such, it is imperative that the Club be able to promote itself and its benefits to the widest possible audience to attract members. Instead, the Club has had to place its publicity campaign and March 14 gala launch party/fund raiser on hold. *Id.* The lawsuit has scared off potential members and made it difficult to get a professional triathlete to be the guest speaker, and the Club was also forced to cancel its order for team uniforms bearing the NYC Tri Club name and Statue of Liberty logo. *Id.* Several members have asked for their uniform money back. *Id.* The uniform order is on hold until the present motion is decided, but given the nine to twelve-week

lead time needed to have uniforms made, it may not be possible to order uniforms in time for this season. *Id.*

This lawsuit has also caused members and prospective members to become nervous about the viability of the NYC Triathlon Club. *Id.* ¶ 27. Some members are contemplating leaving the Club and prospective members are having second thoughts about joining in the first instance. CV Decl. ¶ 25. In fact, the Club has received inquiries from approximately 25% of its membership about the status of the Club because of the uncertainty caused by this litigation. *Id.* Some members have asked for refunds, and four members of the Board of Directors have resigned. *Id.*

Additionally, members and prospective members are having great difficulty finding the Club's website because of the injunction and the Club's inability to redirect inquiries to the new domain name triathlonclubnyc.com, which is not yet included in Yahoo! or Google search results. CV Decl. ¶ 28. If the preliminary injunction is not vacated the Club may not be able to operate at all, even if it eventually prevails on the merits.

## ARGUMENT

### I. The Preliminary Injunction Should Be Vacated.

A district court has complete power over its interlocutory orders, including preliminary injunctions, permitting it to afford relief as necessary. *See* Fed. R. Civ. P. 60(b) advisory committee's note ("[I]nterlocutory judgments are not brought within the restrictions of [Rule 60(b)], but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires."). *See also Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 625 (2d Cir. 1962). Thus, the Court has continuing plenary power over a preliminary injunction and has the equitable discretion to vacate or revise its interlocutory order at any time before a final judgment is entered. *See Marconi Wireless Tel. Co. of Am. v. United*

*States*, 320 U.S. 1, 47–48 (1943); *Update Art, Inc. v. Charnin*, 110 F.R.D. 26, 35–36 (S.D.N.Y. 1986).

Under the present circumstances, because the NYC Triathlon Club was unable to secure counsel in time for the March 9, 2010 hearing, the Court never had the opportunity to consider any of the Club's evidence or arguments in opposition to Plaintiff's motion for a preliminary injunction, and Plaintiff's motion was treated as unopposed. Now, however, given that the Club is represented by counsel who can present its opposition position, justice requires that the Court reconsider the appropriateness of the preliminary injunction anew.

By way of this Motion and the supporting papers, the NYC Triathlon Club respectfully requests that the Court exercise its discretion and vacate the preliminary injunction. As discussed in more detail below, Plaintiff cannot demonstrate that it is likely to succeed on the merits of its claims, that it will be irreparably harmed without an injunction or that the balance of the hardships is in its favor. Thus, the Court should vacate the injunction.

## II.  <u>Plaintiff Failed to Meet Its Burden</u>

The preliminary injunction should be vacated because Plaintiff cannot meet its high burden for showing that it is entitled to such relief. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted). In *Winter v. Natural Res. Def. Council, Inc.*, the Supreme Court recently clarified that to obtain a preliminary injunction, a plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in

the public interest." 129 S. Ct. 365, 374 (2008). All four requirements must be satisfied. *Id.* Plaintiff cannot satisfy that burden here.

**A.     Plaintiff Is Not Likely To Succeed on the Merits**

Plaintiff is not likely to succeed on the merits of any of its federal, state or common law claims of trademark infringement and unfair competition, dilution, or cybersquatting.

1.     Plaintiff's Purported Marks Are Not Entitled to Trademark Protection

a.     Plaintiff's Marks Are Generic

"A generic term is one that refers to the genus of which the particular product is a species." *Park'n Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) *citing Abercombie & Fitch Co. v. Hunting World, Inc*., 537 F.2d 4, 9 (2d. Cir. 1976). In other words, a generic term is the name of a product or service itself. Generic terms are not registrable. *Park'n Fly*, 469 U.S. at 194 *citing* 15 U.S.C. §§ 1052, 1064(c). Public policy precludes affording trademark protection to generic terms because it "would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are." *CES Publ'g Corp. v. St. Regis Publ'ns Inc.*, 531 F.2d 11, 13 (2d Cir. 1975) (affirming denial of preliminary injunction because term "Consumer Electronics" was generic for a magazine). Therefore, "even proof of secondary meaning . . . cannot transform a generic term into a subject for trademark." *Abercrombie & Fitch*, 537 F.2d at 9 (citing cases) ("[N]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name").

For composite marks, the public policy against protecting a generic term as a trademark "applies equally to a generic component of a trademark." *Am. Cyanamid Corp. v. Connaught*

*Labs., Inc.*, 800 F.2d 306, 308 (2d Cir. 1986). Whether composite marks are generic must be determined by examining the composite marks as a whole rather than each portion individually. *See Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 215 (2d Cir. 2003). A geographic component of a composite mark may be generic when used to refer to the generic type of product itself. *See, e.g., Ariz. Int'l Ltd. v. Merrill Lynch Realty Operating P'ship*, 22 U.S.P.Q.2d 1156 (D. Ariz. 1991) (ARIZONA REALTY generic for real property services associated with Arizona); *In re A La Vielle Russie, Inc.*, 60 U.S.P.Q.2d 1895 (T.T.A.B. 2001) (holding RUSSIANART generic for dealership services in the field of fine art, antiques, furniture and jewelry). In addition, "[a]n abbreviation of a generic name which still conveys to the buyer the original generic connotation of the abbreviated name, is still 'generic.'" Thomas J. McCarthy, 12 MCCARTHY ON TRADEMARKS § 12:37 at 125–26 (hereinafter "McCarthy").

If a term is not federally registered as a trademark, the plaintiff "bears the burden of proving that it is not generic as applied to the products at issue." *E. R. Squibb & Sons, Inc., v. Cooper Labs, Inc.*, 536 F. Supp. 523, 529 (S.D.N.Y. 1982) (finding "Angle" to be generic for angled toothbrushes) citing *Reese Publ'g Co., Inc. v. Hampton Int'l Commc'ns, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980) (holding "Video Buyers Guide" magazine to be generic). Evidence to prove that a term is generic may include uncontested generic use by competitors, plaintiff's own use of a term as a generic name, dictionary definitions, media usage, testimony of persons in the trade, and consumer surveys. *See* McCarthy § 12:13 at 43-47.

Here, Plaintiff alleges that it possesses common law trademark rights to the terms New York City Triathlon, NYC Triathlon, and NYC Tri (collectively, "Plaintiff's NYC Triathlon Marks"). Pl.'s Br. at 1. Interestingly, although Plaintiff has been using these purported trademarks for over ten years, it only filed applications for registration with the U.S. Patent &

Trademark Office on January 27, 2010, shortly before filing this lawsuit. Moreover, to the best of the Club's knowledge, Plaintiff has never even publicized its claim to trademark rights in those phrases by using the universally recognized ™ symbol in any advertisement or promotional materials or on merchandise *Id.* at 23. Accordingly, Plaintiff cannot meet its burden of proving that its mark is not generic.

Plaintiff's purported mark New York City Triathlon describes the service Plaintiff provides, namely a triathlon in New York City. Also, Plaintiff's purported mark NYC Triathlon is merely an abbreviation that conveys the same generic connotation as New York City Triathlon. Finally, "Tri" in NYC Tri is clearly an abbreviation that still conveys the same generic connotation as New York City Triathlon.

Plaintiff also falsely alleges that since 2001, it has "exclusively used its well-known" name The New York City Triathlon and variants. Pl.'s Br. at 2. In fact, a competing organization known as "NEW YORK TRIATHLON" has existed for over 20 years—well before Plaintiff's first purported use of its marks. CV Decl. ¶ 15, Ex. 9. NEW YORK TRIATHLON also promotes and organizes triathlon and duathlons (run/bike/run) in New York City and elsewhere in the State. NEW YORK TRIATHLON's uncontested use of its mark is evidence of the genericness of Plaintiff's purported marks.

Further, Plaintiff's own evidence demonstrates the media's use of Plaintiff's purported marks as generic terms that refer to the race itself. For example, on July 27, 2009, *The Wall Street Journal* referred to "the New York City triathlon" without capitalizing the "t" in "triathlon" as would be expected if it were referring to the source or sponsor of the race. Korff Decl. Exs. H, Q (*USA Today* July 11, 2005; *AP* July 16, 2006).

In sum, Plaintiff's NYC Triathlon Marks are generic as they merely describe the location and type of race organized by Plaintiff. Accordingly, Plaintiff's marks are not protectable and it is not likely to succeed on the merits of its trademark and unfair competition claims or its dilution claims.

2.    Even If Plaintiff's Marks Are Descriptive, Plaintiff's Marks Have Not Acquired Secondary Meaning

"If an unregistered mark is deemed descriptive, proof of secondary meaning is required for the mark to be protectable." *Thompson Med. Co., Inc.  v. Pfizer Inc.*, 753 F.2d 208, 216 (2d Cir. 1985). "Secondary meaning" is achieved only when "consumers associate [the mark] with a single source, even though the source itself may be unknown." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993). The party asserting a protectable trademark right has the burden of establishing that a descriptive mark has acquired secondary meaning. *See Thompson*, 753 F.2d at 217. "Proof of secondary meaning entails vigorous evidentiary requirements." *Id*. (quotation and citation omitted).

In determining whether a mark has acquired secondary meaning, courts consider advertising expenditures, consumer studies linking the name to a source, sales success, unsolicited media coverage, attempts to plagiarize the mark, and length and exclusivity of the mark's use. *Id*. Evidence of extensive expenditures on advertising or large sales volumes, however, does not necessarily establish secondary meaning. Indeed, "sales success is not necessarily indicative of secondary meaning, [as it] can be attributed to many other factors . . . ." *Cicena Ltd. v. Columbia Telecomm. Group,* 900 F.2d 1546, 1551 (Fed. Cir. 1990) (applying Second Circuit law). "Merely showing that a certain amount was spent on advertising provides little support for secondary meaning." *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 371 (E.D.N.Y. 2007) (citations and quotations omitted). Rather, the

advertisements must demonstrate use of the marks to identify source or sponsorship of the good or services. *Id.* (to find secondary meaning, "[i]t must be shown that there was promotion of the mark as an identifier for the product") (citations and quotations omitted). As discussed below, Plaintiff's attempts fall short of establishing secondary meaning.

First, as discussed above, Plaintiff's use has not been exclusive. Rather, Plaintiff has coexisted with NEW YORK TRIATHLON for its entire existence. CV Decl. ¶ 15.

Second, while Plaintiff's triathlon has achieved some success and Plaintiff has apparently expended large sums on advertising, there is nothing about its ads or other promotional materials or merchandise that indicates a single source or origin of the race, namely, Plaintiff. In fact, all of Plaintiff's circumstantial evidence leads to a contrary finding.[1] At least as early as 2003, Plaintiff's race was sponsored by Ford Motor Company and referred to as the FORD New York City Triathlon. Korff Decl. ¶ 15. In 2006, Nautica replaced Ford as the primary sponsor, and the race became known as the NAUTICA New York City Triathlon. *Id.* ¶ 26. Plaintiff's materials promoting the race, publicity referring to the race, and merchandise consistently use FORD or NAUTICA (depending on the year) in combination with the race name New York City Triathlon, so that consumers cannot divine that there is a single source of the race beyond possibly FORD or NAUTICA. Ford and Nautica's well-known logos dominate the advertising due to the emphasis on their color, size and font over the less dominant, inherently weak race

_____

[1] Significantly, Plaintiff's evidence goes almost entirely to its promotion and advertising of the "New York City Triathlon" and "NYC Triathlon" names. Although it attempts to bundle those names with its claimed "NYC Tri" mark, Plaintiff has in fact submitted little to no evidence of secondary meaning with respect to that purported mark, which is referenced only sporadically if at all in its submission, and thus Plaintiff cannot show any likelihood of success on its claim to have trademark rights in "NYC Tri."

name used by Plaintiff. *See id.* at Exhibits D, E,[2] H. Additionally, the sponsor's name is often run together with New York City Triathlon without any differentiation between the wording or use of ™ or ® symbols to separate the sponsor's mark from the name of the race. *See id.* Thus, there is no indication that FORD or NAUTICA is merely a sponsor of an event originated and run by someone else. The press likewise refers to the race using the sponsor name. *See, e.g., id.* at Exhibit M (NYT July 16, 2006: "Athletes came to the park . . . to promote the Nautica New York City Triathlon today"), N (Newsday, July 22, 2007: reporting on a triathlete who "trained hard to compete in the Nautica New York City Triathlon on Sunday"), Q (Business Standard, July 20, 2008: "as the Nautica New York City Triathlon gets under way").[3]

Finally, as discussed below, Defendant did not intend to copy Plaintiff's marks. Defendant chose the name NYC Triathlon Club primarily because it was generic or merely descriptive.

---

[2] Exhibits D and E respectively show FORD New York City Triathlon "presented by Accenture," and NAUTICA New York City Triathlon "presented by Toyota," thus making it even more difficult for consumers to figure out who the source of the race is, Ford or Accenture, Nautica or Toyota. In any case, no one would take away from these materials that New York City Triathlon indicates source in some other race organizer, let alone that it is Plaintiff.

[3] The media also do not consistently use the claimed mark. For example, Eye Witness News reported on the race as the "NYC Nautica triathlon." NY1 referred to the event as simply the "Nautica Triathlon," and ABC in Louisville referred to the race as the "Nautica New York Triathlon." *See* Korff Decl. at Ex. O. Given how inherently weak Plaintiff's race name is, Plaintiff cannot possibly prove acquired distinctiveness by relying on evidence that does not show the mark being used correctly.

3.       Even If Plaintiff Has Protectable Trademark Rights,
         There Is No Likelihood of Confusion

         a.       Strength and Similarity of the Marks

"The policies of trademark law disfavor according exclusive rights to marks that are descriptive" and only provide "*a minimal scope of protection*, upon establishing that the mark had acquired a secondary meaning as a designator of source." *TCPIP Holding Co., Inc.*, v. *Haar Commc'ns, Inc.*, 244 F.3d 88, 100 (2d Cir. 2001) (emphasis added).  As explained by the Second Circuit, the reasons for the narrow scope of protection afforded to descriptive marks are twofold:

> The first is that granting one merchant a monopoly over the use of descriptive marks tends unfairly to prevent competing merchants from employing appropriate descriptive terms in their marketing. The second has to do with the character of descriptive marks in relation to the likelihood of consumer confusion. The more arbitrary and fanciful the mark in relation to the goods on which it is used, the more the consumer is likely to assume that a similar mark designates the owner of the first as the source of the goods. … Conversely, the more descriptive the mark is of the goods, the less likely a consumer is to assume that a similar mark used on related goods came from the same source. The similarity between the two marks is as likely explained by the fact that each seeks to describe the goods, as by their coming from the same merchant.

*Id*. at 100–01.  Therefore, the weaker the mark, "the more the differences will stand out between one weak descriptive mark and another." *Monarch Licensing, Ltd. v. Ritam Int'l, Ltd.*, 24 U.S.P.Q.2d (BNA) 1456, U.S. DIST. LEXIS 8225, at *18–19 (S.D.N.Y. 1992).  Plaintiff concedes that its purported marks are descriptive. *See* Pl.'s Br. at 9.  Accordingly, even slight differences between Plaintiff's and Defendant's marks will eliminate any confusion.

Here, there can be no dispute that such differences exist.  First, "NYC Triathlon Club" includes the word "club," which does not appear in Plaintiff's New York City Triathlon Marks. Further, Plaintiff always incorporates the primary sponsor's famous house mark, *e.g.*, NAUTICA New York City Triathlon.  These two differences preclude a likelihood of confusion.  Indeed, the

evidence shows that more similar club and race names coexist peacefully in other cities. CV Decl. ¶ 12, Ex. 4, Ex. 8, PH Decl. ¶¶ 11–12, AA Decl. ¶¶ 7–8, DC Decl. ¶ 6.

Moreover, viewed as they are presented in the marketplace, *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 490 (S.D.N.Y. 2004) (quotation omitted), the parties' respective logos further reduce any likelihood of confusion, *compare* NAUTICA logo at Korff Decl. Ex. E *with* the NYC Triathlon Club's logo at Korff Decl. Ex. FF.

b.      Similarity of Services

Under this factor, courts consider whether the two products compete with each other. *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573–74 (2d Cir. 1993) (holding that lip balm and deodorant/antiperspirant share some channels of trade, but that this factor alone does not make the goods proximate); *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582 (2d Cir. 1991). Here, while the parties' services both generally relate to triathlons, Plaintiff grossly overstates the similarity of their services. *See* Pl. Br. at 15-16.

Plaintiff organizes an annual race held in New York City, whereas the Club offers group training sessions, seminars and social events year-round.

Plaintiff's argument that a club that helps athletes train for triathlons is "used together" with the race itself is unsupported. The Club's services are, in part, preparing for triathlons, while the Plaintiff's services are an annual race taking place in New York City. More importantly, race organizers do not also run training clubs and *vice versa*. *See* CV Decl. ¶ 25.

c.      Bridging the Gap

This factor looks to either the likelihood that a plaintiff will enter defendant's business or the average customer's perception of that likelihood. *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 963 (2d Cir. 1996). Here, Plaintiff makes only an unsubstantiated statement

that it "seriously considered" forming a training club and the *ipse dixit* argument that the public would believe that Plaintiff commissioned the Club. *See* Pl. Br. at 16–17; Korff Decl. at ¶ 37. However, Plaintiff submitted no evidence showing any steps it has taken to form such a club or that consumers would believe a race promoter would sponsor such a club; indeed, the club's evidence establishes just the opposite. PH Decl. ¶¶ 11–12, AA Decl. ¶¶ 7–8, DC Decl. ¶ 6.

### d. Actual Confusion

Plaintiff overstates the significance of the single e-mail it received concerning the Club.[4] Without a declaration from the author explaining the circumstances under which he received an e-mail about the Club, Plaintiff's speculations should not be given any weight. Moreover, the Club's December 2009 mass e-mail went to thousands of people. CV Decl. ¶ 10. Furthermore, in January 2010, Defendant issued a press release about its name change that was picked up by internet sites accessible to people around the globe. Yet, Plaintiff received only one e-mail from an allegedly confused person.

Even if this one e-mail is considered to be an instance of actual confusion, standing on its own it is insufficient to support a likelihood of confusion. *See Savin Corp. v. Savin Group*, 391 F.3d 439, 459 (2d Cir. 2004) ("A single anecdote of confusion over the entire course of competition [ ] constitutes *de minimis* evidence insufficient to raise triable issues") (citation and quotation omitted); *Mr. Water Heater Enters., Inc. v. 1-800-Hot Water Heater, LLC*, 648 F. Supp. 2d 576, 588 (S.D.N.Y. 2009) (same). A small number of confused persons is not enough to find in a plaintiff's favor on the actual confusion factor. *See Nora Beverages, Inc. v. Perrier*

---

[4] Plaintiff also distorts the e-mail, claiming it supports the assertion that "Mr. Vandaele, rather than continuing to properly pay for his affiliation with the NYC Triathlon, had decided to just take our name . . . ." Korff Decl. ¶ 49. That e-mail never mentions Mr. Vandaele, let alone ascribes any motive to Mr. Vandaele.

*Group of Am., Inc.*, 269 F.3d 114 (2d Cir. 2001) (two allegedly confused customers was *de minimis* and did not support a finding of likelihood of confusion).  Clearly, if a small number of confused customers is not sufficient, then one isolated instance is not sufficient either.

> e.    Defendant's Good Faith

Although bad faith adoption of a trademark is a factor in the likelihood of confusion analysis, mere knowledge of the senior user's mark is not. *W.W.W. Pharm. Co.*, 984 F.2d at 575.[5] Rather, as admitted by Plaintiff, awareness of the prior user's mark is irrelevant where the defendant has a "credible explanation" for its adoption of the mark. Pl. Br. at 18, citing *Artisan Mfg., Corp. v. All Granite & Marble Corp.,* 559 F. Supp. 2d 442, 452 (S.D.N.Y. 2008).  Here, Plaintiff's arguments of bad faith are based on unsupported assumptions arising solely from the Club's awareness of Plaintiff's mark, without any consideration of the legitimate reasons for selecting NYC Triathlon Club.

Mr. Vandaele selected the name because he preferred a generic name that simply informed triathletes of the location and purpose of the club. CV Decl. ¶ 12.  Indeed, the name follows the standard naming convention for triathlon clubs. *Id*.

The Club never believed that this might violate Plaintiff's claimed trademark rights, because the Club was unaware that Plaintiff used anything other than a description to identify the nature and location of the event, *i.e.*, NAUTICA New York City Triathlon. *Id*. at ¶ 25.  The Club's name is not intended to draw an association with Plaintiff, but rather to identify the purpose and location of the Club using the most obvious words possible.

---

[5] Indeed, under the "second comer doctrine," a junior user's duty to avoid a known prior user's mark "is triggered only where the senior user's mark is highly distinctive." McCarthy § 23:118, citing *Mobil Oil Corp. v. Pegasus Petroleum Corp*., 818 F.2d 254 (2d Cir. 1987).  As already discussed, Plaintiff's claimed trademark is certainly not highly distinctive.

Plaintiff also argues that the Club's failure to respond to the cease and desist letter demonstrates bad faith.  While it may not have been the most savvy decision, the Club did not respond to the letter because it considered the claims so lacking in merit that the letter did not deserve a response. CV Decl. ¶ 25.  In hindsight, perhaps a response would have been the better course of action, but the lack of response evidences only the Club's conviction that it had done nothing wrong, not bad faith.

Contrary to Plaintiff's unsupported arguments, SBR's decision not to sponsor the 2009 race had nothing to do with the formation of the Club.  Rather, SBR could not justify the expense.  SBR nevertheless remained involved with the event by operating a booth at the race's expo.  Moreover, SBR fully intended to continue to support the 2010 race by operating a booth at the expo associated with the race, until Plaintiff retaliated by refusing to accept SBR's association with the race in view of the present lawsuit. Korff Decl. ¶ 48.  Plaintiff's assertion that "Defendant decided that rather than pay a sponsorship fee to be affiliated with Plaintiff it would simply change its name to Plaintiff's name," Plaintiff's Br. at 18, is self-serving speculation that is contradicted by the facts.

Finally, Plaintiff tries to paint SBR as a serial trademark infringer by referring to an incident from four years ago when Mr. Vandaele was part of an informal group that decided to participate in a training day modeled on the distances used by the famous IRONMAN race. CV Decl. ¶ 23.  Use of "iron" as a short hand to designate such distances is common in the field. *Id*., Ex. 12.  Mr. Vandaele was not the organizer of any event using the term IRON.  But as word of the informal training day spread, Mr. Vandaele became the target of negative publicity around use of the word IRON, and he received a cease and desist letter from the IRONMAN trademark owner.  Consequently, the group cancelled the training day. *Id*. ¶ 23.  There is no comparison

between that situation and this one and thus no inference to be drawn between the two isolated events taking place four years apart.

f.      Quality of Defendant's Services

Plaintiff points to no evidence to that the Club offers low quality services. Instead, the two instances of supposed "sub-par business practices" cited by Plaintiff do not refer to the Club's activities or even to activities related to the predecessor SBR Tri Club. Rather, these instances relate to SBR's retail operations, which have nothing to do with the Club and were separate from the SBR Tri Club. The first involved an allegedly mistreated raffle winner, who did not believe the incident was such a big deal. CV Decl. ¶ 21. Moreover, the winner informed Plaintiff that once Mr. Vandaele got involved the matter was quickly and professionally resolved, and even copied Plaintiff on his e-mail thanking Mr. Vandaele. *Id.* Yet, Plaintiff's motion papers were noticeably silent on this. Mr. Vandaele, as owner of the SBR store, has a stellar reputation in the triathlon community. *Id.* ¶ 19. Indeed, Plaintiff itself relied on Mr. Vandaele to help set up the expo associated with its triathlon event, *id.* ¶ 18, and admittedly allowed SBR to sponsor the event for years. *Id.* Only after this lawsuit did Plaintiff sever its ties to SBR. Korff Decl. ¶ 48.

The other incident raised by Plaintiff pertains to SBR offering NYC Triathlon shirts during the 2004 expo. At that time, unlike other major triathlons, the event did not have official finish line t-shirts. So, SBR printed "NYC Triathlon Finisher" t-shirts, which it intended to provide for free with purchase at SBR's expo booth. About two hours in to the expo, Plaintiff objected to the promotion. SBR immediately stopped offering the shirts and ended up destroying most of the 200 shirts that had been made. CV Decl. ¶ 22. Plaintiff has not alleged that the shirts were of shoddy quality or that the promotion was otherwise not carried out professionally by

SBR during the approximately two hours for which it lasted. This incident is thus completely irrelevant to the quality of the Club's training services, or even to the quality of SBR's services as a retailer, and should therefore be given no weight.

Indeed, while no consumer-oriented business can please all of the people all of the time, Plaintiff has raised only one minor incident relating to SBR's retail operations and no evidence as to the quality of the Club or the predecessor SBR Triathlon Club. Moreover, Mr. Vandaele has submitted testimonials from satisfied customers attesting to the high quality of SBR's services. CV Decl. Ex. 11. Thus, the weight of the evidence shows that this factor does not favor Plaintiff.

g. Sophistication of the Consumers

This factor analyzes the "general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *W.W.W. Pharm.*, 984 F.2d at 575 (citation and quotation omitted). Here, the ordinary purchaser is highly discerning and sophisticated regardless of whether the purchaser is a first-time amateur, an experienced age grouper, or a professional. Competing in and training for a triathlon involves dedication and relatively high costs for equipment and race entry fees. *See* Korff Decl. at ¶ 38 (entry fees range from $250 to $500). Accordingly, participants exercise care in researching training groups and the races to enter. Further, the fact that all 5,600 entry spots for the New York City Triathlon sold out in fewer than seven minutes, Korff Decl. ¶ 27, evidences the close level of attention paid by the ordinary purchaser. Accordingly, this factor weighs in Defendant's favor.

4.         Plaintiff Is Not Likely To Succeed on Either Its Federal or State
                Dilution Claims

Relief for dilution of a mark is only afforded to famous (federal law) or extremely strong (NY state law) marks. Plaintiff's New York City Triathlon Mark — known only to niche consumers participating in or following the sport of triathlons — satisfies neither requirement. Moreover, Plaintiff has failed to show that its marks are likely to suffer any dilution as a result of the Club's activities.

a.        Plaintiff's Federal Dilution Claim Must Fail Because Its
              Marks Are Not Famous                     .

Under the Trademark Dilution Revision Act of 2006 ("TDRA"), 15 U.S.C. § 1125(c) (2009), a trademark owner must demonstrate that its mark is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner" in order for the mark to qualify as famous, and thus protectable under the TDRA. *See also Burberry Ltd. v. Euro Moda, Inc*., 08 Civ. 5781, 2009 U.S. Dist. LEXIS 53250, at *31 (S.D.N.Y. June 10, 2009) quoting 15 U.S.C. §1125 (c) (2) (A).

Very few trademarks qualify as famous marks. *See* McCarthy § 24:92. Marks are classified as "famous" only if they are household names. *TCPIP Holding*, 244 F.3d at 99 (noting Congress's examples of famous marks such as Dupont, Buick and Kodak, which "for the major part of the [20th] Century have been household words throughout the United States"). Miscellaneous press clippings, some publicity, and conclusory allegations that "the marks are used throughout the United States and around the world" are insufficient to establish that marks are truly famous nationwide, as required under the TDRA. *Christopher D. Smithers Found., Inc. v. St. Luke's-Roosevelt Hosp. Ctr*., No. 00 Civ. 5502, 2003 U.S. Dist. LEXIS 373, at *17 (S.D.N.Y. Jan. 13, 2003).

In this case, Plaintiff has submitted no evidence to suggest that its marks have achieved recognition beyond the triathlon community. Even if Plaintiff's marks could be said to have achieved "fame" within the triathlon community, fame in a specific niche is insufficient to qualify for protection under the TDRA. *See TCPIP Holding*, 244 F.3d at 99; *Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 307 n.90 (S.D.N.Y. 2007) (the TDRA excludes dilution claims based on "niche" fame, *i.e.* "fame limited to a particular channel of trade, segment of industry or service, or geographic region"). Thus even if every triathlete in the world knew of Plaintiff, that still would not qualify its marks as famous. Nor would it be enough for the mark to be known throughout New York City.

Lastly, that Plaintiff has not even yet obtained registration of its allegedly famous marks, and only recently applied to register its marks weighs heavily against Plaintiff. 15 U.S.C. § 1125(c)(2)(A)(iv); Korff Decl. ¶ 43.

> b.     Plaintiff's State Dilution Claim Must Fail Because Its Marks Are Not Sufficiently Distinctive     .

To succeed on a claim under N.Y. General Business Law § 360-l, a plaintiff "must prove (1) that the trademark is truly distinctive or has acquired secondary meaning, and (2) a likelihood of dilution either as a result of 'blurring' or 'tarnishment.'" *U-Neek v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 158, 175 (S.D.N.Y. 2001). "Only extremely strong marks" are entitled to protection. *Welch Allyn, Inc. v. Tyco Int'l Servs. AG*, 200 F. Supp. 2d 130, 150 (N.D.N.Y. 2002) *citing Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir. 1983). While this does not mean that the mark must be famous as required under federal law, weak marks do not qualify for protection against dilution claim under this statute.

Moreover, in examining the "distinctiveness" of a mark under § 360-l, a court looks to the same factors that are examined when assessing the strength of a mark in the context of a §

1125(a) claim. *See Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir. 1989) ("[D]istinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes."). As discussed above, Plaintiff's marks are weak and have not achieved secondary meaning. Thus, Plaintiff is not entitled to protection under N.Y.G.B.L. § 360-l.

> c. Even If Its Marks Were Sufficiently Famous or Distinctive,
> Plaintiff Cannot Prove Blurring or Tarnishment .

Proof that Plaintiff is likely to suffer dilution of its famous or distinctive marks by blurring or tarnishment is required under both statutes. *U-Neek*, 147 F. Supp. 2d at 175; *Mead Data Cent.*, 875 F.2d at 1031. Here, Plaintiff will suffer neither.

In determining whether there is dilution by blurring under either federal or state law, courts may consider six non-exhaustive factors.[6] *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 106 (2d Cir. 2009) (federal law); *N.Y. Stock Exch., Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 558 (2d Cir. 2002) (state law). Most of these factors have been discussed previously in the likelihood of confusion section, and show that dilution by blurring is unlikely under the facts of this case. Additionally, Plaintiff is already coexisting with NEW YORK TRIATHLON, which has existed for over 20 years, competes directly with Plaintiff in organizing triathlon races, and uses a name that is no less similar to Plaintiff's alleged marks than the Club's name, thus foreclosing Plaintiff's exclusive use of the words "New York" and "Triathlon." *See* 15 U.S.C. § 1125(c)(2)(B)(iii); CV Decl. ¶ 15.

---

[6] The factors are: (1) the similarity of the mark; (2) the distinctiveness of the mark; (3) the owner's exclusive use of the mark; (4) the mark's degree of recognition; (5) bad faith; and (6) any actual association between the marks.

Nor is there tarnishment in this case, which is typically only found where a distinctive mark is depicted in a context of sexual activity, obscenity, or illegal activity. *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 44 (2d Cir. 1994). As discussed above, Plaintiff has submitted no evidence to suggest that the Club's services are likely to be inferior or of shoddy quality.

5.      The Club Did Not Violate the ACPA

To successfully assert a claim under the ACPA, a plaintiff must demonstrate that: (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; **and** (3) the defendant had a bad faith intent to profit from that mark. *Dudley v. HealthSource Chiropractic, Inc.*, 585 F. Supp. 2d 433, 438 (W.D.N.Y. 2008) (finding that plaintiff was not likely to succeed on its ACPA claim).

Plaintiff has not proved these elements. First, as fully explained above, Plaintiff failed to show its marks were distinctive at the time the domain name nyctriclub.com was registered. Under the ACPA, "distinctiveness refers to inherent qualities of a mark . . . even a famous mark may be so ordinary, or descriptive as to be notable for its lack of distinctiveness." *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 497 (2d Cr. 2000) (citations omitted). The Plaintiff's use of "New York City" as a geographic descriptor in combination with the generic term "triathlon," is not sufficiently distinctive to sustain an ACPA claim.

Second, the domain name nyctriclub.com is not identical to Plaintiff's New York City Triathlon Marks, none of which includes the word "club." *See Sporty's*, 202 F.3d at 498 (noting that "the domain name sportys.com is not precisely identical to the SPORTY'S mark"). The domain name is also not confusingly similar to Plaintiff's asserted marks, for the reasons discussed *supra* when comparing the Club's name to Plaintiff's name.

Finally, as shown above, the Club did not and does not have a bad faith intent to profit from Plaintiff's race name. The intent in forming the Club was to spin off the popular SBR Tri Club into an independent triathlon club in New York City, similar in structure and mission of the LA Tri Club. *See* CV Decl. at ¶ 12–13. Mr. Vandaele manifested his *bona fide* intent to use the mark by registering the domain name nyctriclub.com>, an obvious abbreviation for the anticipated name of the successor club, NYC Triathlon Club. CV Decl. ¶ 8, Ex. 8; *Dudley*, 585 F. Supp. 2d at 441 (noting that "a bona fide intent to use" can constitute evidence of good faith and finding that the domain name healthsourcechiro.com "is obviously an abbreviation of [defendant's] legal name" Healthsource Chiropractic, Inc.). At the time of registration, the Club did not believe that its use of the domain name or planned use of the name NYC Triathlon Club would infringe any trademark rights Plaintiff may have had. CV Decl. ¶ 12. Nor did it believe that the name would confuse users, as triathlon race organizers customarily do not operate clubs and *vice* versa. *Id*. ¶ 25.

Plaintiff therefore cannot meet its burden and its ACPA claim must fail.

### B. Plaintiff Cannot Show a Likelihood of Irreparable Harm the *Winter* Standard.

To establish irreparable harm, Plaintiff primarily relies on a presumption that a likelihood of confusion creates irreparable harm. As noted above, however, such confusion is not likely, and there is no likelihood of irreparable harm. In any event, the Supreme Court's recent decision in *Winter* forecloses Plaintiff's reliance on that misplaced presumption, and Plaintiff has not proffered sufficient other evidence of irreparable harm under the facts of this case to justify injunctive relief.

1.     Recent Supreme Court Law Has Clarified The Legal
            Standard For Irreparable Harm.

Prior to *Winter*, decisions of this Circuit suggested that, once a Plaintiff established a likelihood of confusion irreparable harm was presumed. *See, e.g.*, *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997). *Winter* now mandates a different approach.

In *Winter*, the Supreme Court reversed a preliminary injunction on the ground that the standard applied by the Ninth Circuit, which allowed imposition of injunctive relief upon a showing of only "possibility" of harm, was "too lenient" and therefore "inconsistent with the characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 129 S. Ct. at 375. The Supreme Court reiterated that injunctive relief may be awarded only where a plaintiff [ ] seeking preliminary relief [can] demonstrate that irreparable injury is likely in the absence of an injunction." *Id.*

Consistent with *Winter*, the Second Circuit has long recognized that "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983). Accordingly, even where a likelihood of confusion exists in a trademark case, various panels of the Second Circuit have recognized that a finding of irreparable harm does not automatically follow.[7] *Id.* at 45-46 (vacating preliminary injunction due to lack of evidence of

---

[7] "A heightened "substantial likelihood" standard may also be required when "the requested injunction (1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006) *quoting Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34-35 (2d Cir. 1995). Given that the fledgling Club

irreparable harm); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275-76 (2d Cir. 1985) ("Even if we were to agree that plaintiffs' likelihood of success is as clear as the district court concluded, on this record plaintiffs still failed to establish the irreparable harm essential to entitle them to the extraordinary relief of a preliminary injunction."); *SMJ Group, Inc. v. 417 Lafayette Rest. LLC*, 439 F. Supp. 2d 281, 293-94 (S.D.N.Y. 2006) (noting that a presumption of irreparable harm does not necessarily follow from establishing confusion).

Decisions in this Circuit addressing *Winter* have continued in this vein. *See, e.g.*, *Citigroup Global Mkts. v. VCG Special Opportunities Master Fund Ltd.*, 2010 U.S. App. LEXIS 5025, 19–20 & n.6 (2d Cir. Mar. 10, 2010) (noting *Winter's* rejection of the "possibility of irreparable harm" standard).

Since Plaintiff has made no showing of irreparable harm in this case, Plaintiff is not entitled to preliminary injunctive relief.

> a.    Plaintiff Is Not Likely To Suffer the Irreparable Harm Required for Preliminary Injunction Relief.

In pre-*Winter* cases declining to adopt a *per se* finding of irreparable harm despite the likelihood of confusion, the Second Circuit has relied on the dissimilarity of the goods/services, non-identity of the marks and risk of harm to its reputation based on the quality of the defendant's goods to determine whether a Plaintiff was at risk of irreparable harm. *See Citibank*, 756 F.2d at 275; *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960 (2d Cir. 1981); *SMJ Group*, 439 F. Supp. 2d at 294.

---

likely will not survive should the preliminary injunction not be vacated, CV Decl. ¶ 29, such a heightened standard is called for in this case.

(1)    The NYC Triathlon Club's Goods and Services Do Not
       Overlap or Compete with Plaintiff's.

In determining whether the Plaintiff is likely to suffer harm from the operation of the NYC Triathlon Club, the issue is not whether the two entities serve the same or overlapping customers and sponsors, but rather whether there is overlap or competition between their goods and services. *See, e.g.*, *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 968 (2d Cir. 1981) (no irreparable harm where the products at-issue differed in non-trivial respects and shared only some areas of competing use); *see also SMJ Group*, 439 F. Supp. 2d at 294 (S.D.N.Y. 2006) (no irreparable harm where defendant's activities were not a substitute for or in derogation of plaintiff's goods and services).

In this case, the Club serves the New York City triathlon community by providing swim, bike and run training sessions, and holding seminars on training and nutrition. CV Decl. ¶ 4.  The Club is comprised of individuals who enjoy the sport of triathlon and are looking for a community with whom they can train and race and socialize.  *Id*.  Unlike Plaintiff, the NYC Triathlon Club does ***not*** organize, stage, or promote triathlon races, and in no way competes with the triathlon operated by Plaintiff. *Id* . ¶ 25.

Far from competing with Plaintiff, the Club in fact tries to help its members train for triathlons, including the event organized and run by Plaintiff.  Thus, if anything, the Club helps promote, rather than harms, Plaintiff.

Given the significant differences between the services offered by Plaintiff and the Club, and the fact that the latter's services are not a substitute for the former's,  Plaintiff cannot show a sufficient likelihood of irreparable harm to justify preliminary injunctive relief.

(2)     The Names At Issue Are Not Identical.

The *Citibank* Court noted that where the names are similar but not identical, the case for irreparable harm is less justified.  756 F.2d at 273-76 (2d Cir. 1985).  The same is true here, where Plaintiff promotes its races as the NAUTICA New York City Triathlon, while the Club uses NYC Triathlon Club and variations thereof all containing the word "club."

(3)     Plaintiff's Reputation Is Not Likely To Be Harmed, and Any Potential Harm Can Be Alleviated by Less Restrictive Means.

Plaintiff makes no showing that its reputation is likely to be harmed by the continued use of the contested names by the Club.  Indeed, the Club's president also founded and operates SBR, one of the premier triathlon retailers in the country.  CV Decl. ¶ 5.  Given the accolades afforded SBR, it is highly unlikely that "a lasting but not readily measurable injury might be inflicted on [Plaintiff's] reputation" through continued use of  the NYC Triathlon Club name. *See Citibank*, 756 F.2d at 276 (considering the unlikelihood that defendant's long-established business would tarnish the plaintiff's reputation); *Bell & Howell: Mamiya*, 719 F.2d at 46 (finding no significant likelihood of damage to plaintiff's reputation absent a showing that defendant's products were inferior to those sold by plaintiff).[8]

In addition, even if Plaintiff might suffer harm based on the theoretical loss of control of its reputation, such harm is not one that demands a remedy between now and the time of trial. For example, Plaintiff admits that its July 2010 triathlon has already sold out, and had nearly

---

[8] The case relied upon by Plaintiff in support of a finding of irreparable harm based on a loss of control of reputation, *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, based its outcome on the finding that "the mere ***possibility*** that defendants could during the interval until trial [damage Plaintiff's reputation] is sufficient to warrant the issuance of a preliminary injunction." 794 F.2d 38, 44 (2d Cir. 1986) (emphasis added).  Such a "possibility" of harm is no longer the standard under *Winter*.

20,000 applicants for 5,600 openings. Korff Decl. ¶ 27. Thus, even if there were a small amount of confusion, Plaintiff still will not suffer any harm in the near term, given that Plaintiff's upcoming race is already sold out. Moreover, any long-term concerns can be addressed in time to avoid potential harm in the future, especially should this matter be set for an expedited trial.

Finally, this Court has wide discretion to craft the least restrictive injunction called for under the circumstances. *See Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 355 (2d Cir. 1983). Given that any confusion in this case — if it exists at all — should be found to be minimal, a simple disclaimer should be considered for eliminating the possibility of harm to Plaintiff's reputation. *See id.* (approving of district court injunction requiring prominent disclaimer to alleviate possible confusion); *Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325 (2d Cir. 1987) (finding that a minimal to moderate amount of consumer confusion could be cured effectively through the use of a disclaimer).

### C. The Balance of Hardships Tips in the Club's Favor.

Even were Plaintiff able to establish irreparable harm, that would not end the inquiry. Rather, a party seeking a preliminary injunction "must demonstrate not only irreparable harm . . . but also . . . that the balance of hardships tips decidedly in [its] favor." *Somoza v. N.Y. City Dept. of Educ.*, No. 06 Civ. 5025, 2006 WL 1981758, at *5 (S.D.N.Y. July 10, 2006). Here, there can be no question that the harm to the Club if the preliminary injunction is maintained far outweighs any incremental harm to Plaintiff if the injunction is vacated, particularly if this matter is set down for expedited trial. As Mr. Vandaele explains, the preliminary injunction is having a dramatic and deleterious effect on the Club. Board members have resigned, Club members have sought refunds, new members cannot find the Club, and the Club has had to cancel its uniform orders. CV Decl. ¶ 26–29. The Club has also had to cancel its fundraising and marketing plans.

*Id.* For a newly founded organization, the preliminary injunction is an unmitigated disaster, and it raises the possibility that even were the Club eventually to win on the merits, it might not survive this litigation.

Plaintiff, on the other hand, will suffer no such detriment were the injunction vacated. Plaintiff's race is already closed to new (non-charity) registrations, having sold out in seven minutes, and the Club does not compete with Plaintiff in either putting on races or in connection with Plaintiff's other income streams, such as the race expo. Korff Decl. ¶ 27; CV Decl. ¶ 17 . Thus, even were some minimal confusion engendered in the short time before an expedited trial on the merits could be held, Plaintiff would suffer no monetary loss of any sort.  Nor would it suffer reputational damage.  And, in the unlikely event that Plaintiff succeeds on the merits and obtains a permanent injunction issued against the Club, Plaintiff's only harm will have been coexisting with the Club for the short period of time between vacatur of the preliminary injunction and entry of the permanent injunction.

On these facts, the balance of the hardships clearly favors the Club, and grant of preliminary relief would be inappropriate.

**D.      Plaintiff Should Post At Least $50,000.00 In Bond.**

If the Court does not vacate the preliminary injunction, the Court should require Plaintiff to post a $50,000.00 bond.  A preliminary injunction may issue only "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *see also AB Electrolux v. Bermil Indus. Corp.*, 481 F. Supp. 2d 325, 336–37 (S.D.N.Y. 2007) (quotations and citations omitted).  While Rule 65(c) gives the court wide discretion to set the amount of the

bond, it cannot dispense with the bond requirement in its entirety. *See Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997).

As explained in detail above, and in Mr. Vandaele's Declaration, the injunction is causing the Club irreparable harm. At a minimum, the Club's reputation and relationship with the triathlon community is suffering. CV Dec. ¶ 26–29. Among other things, because of the injunction, the Club is having difficulty promoting itself to potential members and sponsors, its current membership is declining and Board members have resigned.

A bond of at least $50,000.00 should be required in order to cover the Club's actual damages and provide security for the Club's costs associated with restrategizing its advertising campaign. *See Time Warner Cable, Inc. v. DIRECTV, Inc.*, No. 06 Civ. 14245, 2007 WL 1296205, at *3 (S.D.N.Y. May 2, 2007). To the extent the Club prevails on the merits after trial, it will need to engage in significant corrective advertising to combat the harm to the Club's reputation and to jump start the organization's promotional efforts to make up for time lost while it was enjoined.

### E. Opposition to Plaintiff's Motion to Enforce the Preliminary Injunction

Plaintiff's motion seeking to expand the scope of the preliminary injunction must be denied. As discussed in detail above, Plaintiff's New York City Triathlon Marks merely a combine a geographic descriptor and the generic term "triathlon." That combination is generic, and consequently unprotectible. *See Monarch Licensing*, U.S. DIST. LEXIS 8225 at *5–7. If the combination is not generic, it is so weak that it is entitled to only the narrowest of protection. Given the weakness of Plaintiff's marks, and the limited ways to identify a triathlon training club composed of members who live and/or work in New York City, the NYC Triathlon Club should at a minimum be permitted to use the domain name triathlonclubnyc.com and identify itself as

Triathlon Club NYC and Tri Club NYC.  These interim names comply within the terms of the preliminary injunction, and modifying the injunction to preclude them would be in error.

Nevertheless, Plaintiff seeks to rely on the "safe distance" rule to extend the injunction far beyond its explicit terms and any trademark rights it can legitimately claim.  In the first instance, the "safe distance" rule does not apply here because the Club never had the opportunity to defend itself, as it was not represented by counsel at the hearing.  Further, the Club has not been adjudicated an infringer; it has only been preliminarily enjoined. *See Taubman Co. Webfeats*, 319 F.3d 770, 779-80 (6th Cir. 2003) (refusing to apply the "safe distance" rule when the defendant is not a proven infringer); *see also Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 40-41 (1st Cir. 2002) (employing the "safe distance" rule only after defendant found in contempt of permanent injunction).  Even if the rule did apply, which it does not, the interim names are generic, and therefore should not be enjoined.  None of the cases Plaintiff points to stands for the proposition that keeping a safe distance requires a defendant to stay away from using a generic term or phrase.  In light of the foregoing, the "safe distance" rule is inapplicable.

## CONCLUSION

For the reasons set forth above and upon the facts set forth in the accompanying declarations, Defendant NYC Triathlon Club respectfully requests that the Court grant its motion to vacate the preliminary injunction and deny Plaintiff's motion to enforce the preliminary injunction.

Dated: New York, New York          Respectfully submitted,
       March 23, 2010

By:    /s/ Robert S. Weisbein
    Robert S. Weisbein (RS-0080)
    Karin Segall (KS-6572)
    Akiva Cohen (AC-2400)
    FOLEY & LARDNER LLP
    90 Park Avenue
    New York, NY 10016-1314
    Phone: 212-338-3528
    Fax: 212-687-2329
    E-mail: rweisbein@foley.com
          ksegall@foley.com
          acohen@foley.com

*Attorneys for Defendant*
NYC Triathlon Club, Inc.